**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JON REINER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TELADOC HEALTH, INC., JASON GOREVIC, and MARK HIRSCHHORN,<br><br>Defendants. | Case No. 1:18-cv-11603 GHW<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Wayne Arcuri, Badruddin Salimbhai, and David Williams (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, through Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants; U.S. Securities and Exchange Commission ("SEC") filings; press releases published by and regarding Teladoc Health, Inc. ("Teladoc" or the "Company"); analysts' reports and news articles about the Company; and other publicly available information. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Teladoc securities between March 3, 2016, and December 5, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Teladoc was founded in 2002 and is headquartered in Purchase, New York. Teladoc calls itself the global leader in virtual care. Providing telehealth services worldwide, the Company offers a portfolio of services and solutions covering 450 medical subspecialties,

3. Defendant Mark Hirschhorn ("Hirschhorn") was Executive Vice President ("EVP"), Chief Operating Officer ("COO"), and Chief Financial Officer ("CFO") of Teladoc. Defendant Hirschhorn became the Company's EVP and CFO in October 2012, and took on the additional role of COO in September 2016.

4. Since May 2014, Teladoc had allowed violations of employment discrimination laws, sexual harassment laws, and its own corporate governance policies to take place at the Company. Specifically, Hirschhorn engaged in an affair with a low-level employee of the Company in Texas named Charece Griffin ("Griffin"), and the two engaged in insider trading together.

5. Griffin regularly discussed her relationship with Hirschhorn with other employees at the Company, including telling them that she and Hirschhorn liked to trade Teladoc stock together. Specifically, after Griffin received a stock grant, Hirschhorn would tell her when he thought there were good opportunities to sell some shares. Hirschhorn's track record, Griffin told colleagues, was "pretty good." According to a former employee who worked

with Griffin, Hirschhorn provided Griffin with a substantial amount of money to trade Teladoc stock.

6. After learning about Griffin's inappropriate relationship with Hirschhorn from numerous other disgruntled employees in October 2016, Amy McKay ("McKay"), Teladoc's Clinical Director, vice-president of the Payor Relations unit, and Griffin's ultimate boss, drafted an eight-page document that set forth a timeline of Hirschhorn and Griffin's relationship and detailed the widespread complaints of unfairness in connection with Griffin's stock trades that other employees raised. McKay submitted the memorandum to both the Legal and Human Resource departments of Teladoc.

7. In October 2016, several Teladoc employees also filed police reports addressing harassment (specifically, threatening and disturbing emails directed to their corporate email addresses) they received apparently related to their awareness of Hirschhorn's affair with Griffin. These employees reported the harassment to Teladoc's Human Resources department, yet were told to address the matter with the police department instead, demonstrating the Company's intent to "sweep under the rug" damaging information regarding Hirschhorn or, at the very least, to be willfully blind to such information.

8. The police reports indicate that Teladoc's Human Resources department knew about the allegations against Hirschhorn even before McKay's report. One of these employees' police reports shows that the employee had taken her concerns to the Company's Human Resources department before she received these threatening emails. The employee received the emails in October 2016 – suggesting that she reported concerns regarding Hirschhorn's inappropriate relationship to Human Resources prior to Hirschhorn's promotion to COO on September 28, 2016. Nevertheless, Defendant Gorevic falsely informed several analyst firms

covering the Company, including Credit Suisse and Leerink, that Teladoc was not aware of Hirschhorn's affair at the time of his promotion to COO. In other words, the Company concealed and refused to meaningfully investigate Hirschhorn's misconduct and violations of the Code of Business Conduct and Ethics (the "CBCE"), prior to his promotion to COO, which demonstrates that Teladoc's executives acted intentionally and/or recklessly.

9. McKay learned in November 2016 that the Company had retained an outside law firm to conduct an investigation of her allegations, which were ultimately shown to be accurate.

10. Despite the fact that the outside investigation revealed inappropriate conduct by Hirschhorn, the Company and Gorevic failed to act to ensure that investors would not be harmed. On December 27, 2016, the Company entered into an amended employment contract with Hirschhorn, with two minor slaps on the wrist: a prohibition from violating the employee handbook (which, presumably, he had never been exempt from following in the first place) and, for a period of one year, a suspension of the scheduled share vesting awarded to him as part of his compensation.

11. At all relevant times, the Company purported to be committed to "the highest standards of integrity and ethics in the way it conducts business," and, to that end, adopted a CBCE, which applies to all of its employees, officers and directors, including its chief executive officer, chief financial officer, and all other executive and senior officers. The Company never disclosed that executives were trading stock based upon insider information. In fact, the CBCE, which was publicly available, expressly forbade insider trading.

12. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and misleading statements by failing to disclose that:

(i) Defendant Hirschhorn was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; (iv) the Company's enforcement, including firing of a whistleblower, of its own purported employment and trading policies were inadequate to prevent the foregoing conduct; and (v) as a result, the Company's public statements were materially false and misleading at the time they were made.

13. On December 5, 2018, the Southern Investigative Research Foundation ("SIRF") published an article reporting that Teladoc's CFO, Hirschhorn, had engaged "in an affair with . . . an employee many levels below him on the company's organizational chart." The SIRF article stated that "during their relationship, [the employee] received a series of promotions over colleagues with either more industry experience or better credentials that stunned her former colleagues." A copy of this article is attached as Exhibit A and incorporated herein. Consequently, the employee's annual compensation grew to about $125,000. In addition, the SIRF article reported that the employee and Hirschhorn "liked to trade Teladoc Health's stock together," with Hirschhorn "tell[ing] her when he thought there were good opportunities to sell some shares." According to SIRF, "[a]fter spending months 'bitterly complaining and arguing with the HR and Legal departments over the [Mark Hirschhorn] decision,' according to two of her former colleagues who talked regularly with her during this period about these conversations, McKay was fired late one morning in October, 2017." Meanwhile, Griffin resigned quietly in late 2017. As SIRF noted, Hirschhorn, however, "stayed [in his position] with nearly nary a consequence. . . ." As McKay's counsel later stated,

Hirschhorn's conduct was at the very least "a violation of a bunch of [the Company's] own employee conduct clauses. . . . I am not sure why they tolerated the CFO doing that." Following publication of the SIRF article, Teladoc's stock price fell sharply by $4.00, or 6.69%, to close at $55.81 on December 6, 2018.

14. On or about December 17, 2018, Hirschhorn resigned amid these accusations of misconduct. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Teladoc is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

18. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19. Plaintiffs acquired Teladoc securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

20. Defendant Teladoc is a Delaware corporation with its principal executive offices located at 2 Manhattanville Road, Suite 203, Purchase, New York. Teladoc's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "TDOC."

21. Defendant Jason Gorevic ("Gorevic") has served at all relevant times as the Chief Executive Officer ("CEO") of Teladoc.

22. Defendant Hirschhorn has served at all relevant times as the EVP, COO, and CFO of Teladoc.

23. The Defendants referenced above in ¶¶21-22 are sometimes referred to herein collectively as the "Individual Defendants."

24. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

25. Teladoc was founded in 2002 and is headquartered in Purchase, New York. Providing telehealth services worldwide, the Company offers a portfolio of services and solutions covering 450 medical subspecialties, such as flu and upper respiratory infections, cancer, and congestive heart failure through mobile devices, the Internet, video, and phone. The Company serves health plans, health systems, and other entities. Formerly known as "Teladoc, Inc.," the Company changed its name to "Teladoc Health, Inc." in August 2018.

26. Defendant Hirschhorn became the Company's EVP and CFO in October 2012, and took on the additional role of COO in September 2016.

27. At all relevant times, the Company purported to be committed to "the highest standards of integrity and ethics in the way it conducts business." To that end, it adopted a CBCE which applies to all of its employees, officers and directors, including its chief executive officer, chief financial officer, and all other executive and senior officers.

### Hirschhorn's Improper Relationship and Teladoc's Culture of Misconduct

28. According to the SIRF article published on December 5, 2018, which has been supported and confirmed by subsequent investigation and reports, Teladoc allowed violations of employment discrimination laws, sexual harassment laws, and its own corporate governance policies to take place at the Company for years. Specifically, SIRF reported that Hirschhorn had engaged in an affair with a low-level employee of the Company, Griffin, and that the two engaged in potentially illegal insider trading together. SIRF supported its story with a thorough investigation, including interviews with at least seven former colleagues of Griffin between 2014 and the end of 2017.

29. Griffin joined the Company in May 2014. Thereafter, Hirschhorn and Griffin began a sexual relationship.

30. Griffin regularly discussed her relationship with Hirschhorn with other employees at the Company. SIRF reported that Griffin told her coworkers that she and Hirschhorn liked to trade Teladoc Health's stock together. Specifically, after Griffin received a stock grant, Hirschhorn would tell her when he thought there were good opportunities to sell some shares. Hirschhorn's track record, Griffin told colleagues, was "pretty good." According to a former employee who worked with Griffin, Hirschhorn provided Griffin with a substantial amount of money in order for her to trade Teladoc stock. Upon information and belief, Hirschhorn gave Griffin approximately $10,000 to make trades.

31. After learning of Griffin's inappropriate relationship with Hirschhorn from numerous other disgruntled employees in October 2016, McKay, Teladoc's Clinical Director, vice-president of the Payor Relations unit, and Griffin's boss, drafted an eight-page document that set forth a timeline of Hirschhorn and Griffin's relationship and detailed the complaints of unfairness in connection with Griffin's stock trades that other employees raised. McKay then submitted the memorandum to both the Legal and Human Resource departments of Teladoc.

32. In October 2016, several Teladoc employees also filed police reports addressing harassment (specifically, threatening and disturbing emails directed to their corporate email addresses) they received apparently related to their awareness of Hirschhorn's affair with Griffin. These employees reported the harassment to Teladoc's Human Resources department, yet were told to address the matter with the police department instead, demonstrating the Company's intent to "sweep under the rug" damaging information regarding Hirschhorn or, at the very least, to be willfully blind to such information.

33. One of these employees' police reports shows that the employee had taken her concerns to the Company's Human Resources department before she received these threatening emails. The employee received the emails in October 2016 – suggesting that she reported concerns regarding Hirschhorn's inappropriate relationship to Human Resources prior to Hirschhorn's promotion to COO on September 28, 2016. Nevertheless, Defendant Gorevic falsely informed several analyst firms covering the Company, including Credit Suisse and Leerink, that Teladoc was not aware of Hirschhorn's affair at the time of his promotion to COO. In other words, the Company concealed and refused to meaningfully investigate Hirschhorn's misconduct and violations of the CBCE prior to his promotion to COO, which demonstrates that Teladoc's executives acted intentionally and/or recklessly.

34. Former employees have also stated that the atmosphere at the company was rife with racial tension, with employees pressured to "take sides" based upon their racial background. Further, various supervisors at Teladoc misappropriated the company's resources and engaged in highly inappropriate behavior during what were supposed to be business trips.

35. McKay learned in November 2016 that the Company had retained an outside law firm to conduct an investigation of her allegations, which were ultimately shown to be accurate.

36. Despite the fact that the outside investigation revealed inappropriate conduct by Hirschhorn, the Company and Gorevic failed to act to ensure that investors would not be harmed. On December 27, 2016, the Company entered into an amended employment contract with Hirschhorn, with two minor slaps on the wrist: a prohibition from violating the employee handbook (which, presumably, he had never been exempt from following in the first place) and,

for a period of one year, a suspension of the scheduled share vesting awarded to him as part of his compensation.

37. Approximately ten months later, according to SIRF, "[a]fter spending months 'bitterly complaining and arguing with the HR and Legal departments over the [Mark Hirschhorn] decision,' according to two of her former colleagues who talked regularly with her during this period about these conversations, McKay was fired late one morning in October, 2017." Meanwhile, Griffin resigned quietly in late 2017. As SIRF noted, Hirschhorn, however, "stayed [in his position] with nearly nary a consequence. . . ." As McKay's counsel later stated, Hirschhorn's conduct was at the very least "a violation of a bunch of [the Company's] own employee conduct clauses. . . . I am not sure why they tolerated the CFO doing that." There was no basis for Griffin's promotion, and her performance did not merit such a promotion. In fact, her promotion further raised employee concerns regarding her personal relationships at the Company.

**Materially False and Misleading Statements Issued During the Class Period**

38. The Class Period begins on March 3, 2016, when the Company filed its Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"). A copy of the 2015 10-K is attached as Exhibit B and is incorporated by reference. In the 2015 10-K, the Company falsely touted the reliability and personal ethics of its key executives, stating:[1]

> ***We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business***.
>
> Our success depends largely upon the continued services of our key executive officers. These executive officers are at-will employees and therefore they may terminate employment with us at any time with no advance notice. We maintain "key person" insurance in the amount of $4.0 million for Jason Gorevic, our Chief Executive Officer, but not for any of our other executive officers or any of our

[1] Unless otherwise indicated, all emphasis in quoted material is added.

> other key employees. We also rely on our leadership team in the areas of research and development, marketing, services and general and administrative functions. From time to time, there may be changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business. The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives.
>
> To continue to execute our growth strategy, we also must attract and retain highly skilled personnel. Competition is intense for qualified professionals. We may not be successful in continuing to attract and retain qualified personnel. . . .
>
> Failure to attract new personnel or failure to retain and motivate our current personnel, could have a material adverse effect on our business, financial condition and results of operations.

39. In addition, Defendants acknowledged the importance of executives' personal probity in the 2015 10-K that any "employment claims made by [the Company's] current or former associates . . . may result in substantial costs and may divert management's attention and resources, which may substantially harm [its] business, financial condition and results of operations." Moreover, "[i]nsurance may not cover such claims, may not provide sufficient payments to cover all of the costs to resolve one or more such claims and may not continue to be available on terms acceptable to us. A claim brought against us that is uninsured or underinsured could result in unanticipated costs, thereby reducing our revenue and leading analysts or potential investors to reduce their expectations of our performance, which could reduce the market price of our stock."

40. These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (i) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was

unqualified, thereby negatively impacting the Company's operations; and (iv) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct. In other words, the Company, promoted the competence and experience of its executives, while it was actually or constructively aware of the pervasive violations of the Company's policies. The Company further failed to disclose that one of its executives has been violating such policies, and was at risk of losing his job (which would adversely affect the Company's operations) for his misconduct.

41. On April 15, 2016, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2016 Proxy"), which stated that "Teladoc is committed to the ***highest standards of integrity and ethics in the way it conducts business***." (Emphasis added.) A copy of the 2016 Proxy is attached hereto as Exhibit C.

42. In purported fulfilment of this goal, the 2016 Proxy further stated that "[d]uring 2015, the board adopted a Code of Business Conduct and Ethics, which applies to all of our employees, officers and directors, including our chief executive officer, chief financial officer, and all other executive and senior officers." The 2016 Proxy describes the CBCE as "establish[ing] our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest." The 2016 Proxy further stated that "[u]nder our Code of Business Conduct and Ethics, each of our directors and employees is required to report suspected or actual violations. In addition, we have adopted separate procedures concerning the receipt and investigation of complaints relating to accounting or audit matters."

43. The 2016 Proxy further touted the CBCE, stating that a copy of it was available on the Company's website. A copy of the CBCE is attached hereto as Exhibit D.

44. Section 1 of the CBCE provided that:[2]

> We must strive to foster a culture of honesty and accountability. Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, customers, suppliers, competitors, the government and the public, including our shareholders. All of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior. Even well-intentioned actions that violate the law or this Code may result in negative consequences for the Company and for the individuals involved. One of our Company's most valuable assets is our reputation for integrity, professionalism and fairness. We should all recognize that our actions are the foundation of our reputation and adhering to this Code and applicable law is imperative.

45. In this regard, Section 5 of the CBCE asserts that "[a]ll employees, officers and directors should avoid situations that present a potential or actual conflict between their interest and the interest of the Company." The CBCE describes a conflict of interests as a situation "when a person's private interest interferes in any way, or even appears to interfere, with the interest of the Company."

46. Moreover, Section 3 of the CBCE specifically notes that "[u]sing non-public, Company information to trade in securities, or providing a family member, friend or any other person with a 'tip', is illegal. All such non-public information should be considered inside information and should never be used for personal gain."

47. Section 12 of the CBCE further stated:

> ***The Company's policies for recruitment, advancement and retention of employees forbid discrimination on the basis of any criteria prohibited by law, including but not limited to race, sex and age***. Our policies are designed to

[2] The statements contained in the CBCE cited in this Class Action Complaint appear in the Company's CBCE dated February 22, 2018. Based on information and belief, the operative CBCE contained substantively similar statements throughout the Class Period.

> ensure that employees are treated, and treat each other, fairly and with respect and dignity. In keeping with this objective, conduct involving discrimination or harassment of others will not be tolerated. All employees are required to comply with the Company's policy on equal opportunity, non-discrimination and fair employment, copies of which were distributed and are available from the Legal Department.

(Emphasis added.)

48. These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (i) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (iv) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct. In other words, Griffin was promoted in stark contradiction of Company policy, despite the Company falsely touting its purported fairness. Hirschhorn's conduct also violated Company policy, and Defendants failed to disclose these violations.

49. On March 1, 2017, the Company filed its Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K contained substantively identical statements to those detailed above in ¶¶ 38-39. A copy of the 2016 10-K is attached hereto as Exhibit E. In an earnings call that day, Defendant Gorevic touted Teladoc's "continuing to enhance [its] overall corporate governance program."

50. This statement was false and misleading. Gorevic touted the Company's corporate governance program even as he knowingly and/or recklessly failed to disclose that: (i) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider

trading to provide themselves with undue benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (iv) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct. Despite being aware of Hirschhorn's misconduct, Gorevic failed to disclose it.

51. On April 6, 2017, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2017 Proxy"), which stated that the Company is committed "to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics." A copy of the 2017 Proxy is attached as Exhibit F.

52. In purported fulfilment of this goal, the 2017 Proxy further stated that "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all directors, officers and employees. The purpose of this code is to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics. Our Code of Business Conduct and Ethics establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest."

53. The 2017 Proxy further touted the CBCE, stating that a copy of it was available on the Company's website. Upon information and belief, the CBCE contained the representations set forth in ¶¶ 43-47.

54. These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (i) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue

benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (iv) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct. Defendants failed to disclose clear violations of the CBCE, and failed to disclose that Hirschhorn's misbehavior put him at risk of losing his job.

55. On February 27, 2018, the Company filed its Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K contained substantively identical statements to those detailed above in ¶¶ 38-39. A copy of the 2017 10-K is attached hereto as Exhibit G.

56. These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (i) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (iv) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct. Defendants failed to disclose clear violations of the CBCE, and failed to disclose that Hirschhorn's misbehavior put him at risk of losing his job.

57. On April 20, 2018, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2018 Proxy"), which stated that the Company is committed "to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics." A copy of the 2018 Proxy is attached as Exhibit H.

58. In purported fulfilment of this goal, the 2018 Proxy further stated that "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all directors, officers and employees. The purpose of this code is to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics. Our Code of Business Conduct and Ethics establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest."

59. The 2018 Proxy further touted the CBCE, stating that a copy of it was available on the Company's website. The CBCE contained the representations set forth in ¶¶ 43-47.

60. Additionally, the 2018 Proxy stated that the Company maintained an "Insider Trading Compliance Policy that applies to all securities issued by Teladoc." Further, it stated that under the purported Insider Trading Compliance Policy "Company officers, directors and employees are prohibited from engaging in hedging transactions, including purchasing Teladoc stock on margin or engaging in transactions in puts, calls or other derivative securities designed to hedge or offset any decrease in the market value of Teladoc's equity securities."

61. These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (i) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (iv) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent

the foregoing conduct. Defendants failed to disclose clear violations of the CBCE, and failed to disclose that Hirschhorn's misbehavior put him at risk of losing his job.

**Additional Scienter Allegations**

62. During the Class Period, Defendant Hirschhorn sold or exercised Teladoc stock options equivalent to 275,000 shares for almost $8 million, before commissions and taxes. Through November 2, 2018, he sold another 265,000 shares (nearly 99 percent of what he held in January of that year), for approximately $13 million in proceeds. Importantly, Hirschhorn sold more than $700,000 worth of Teladoc shares on Friday, November 2, 2018, just as SIRF was concluding its investigation and just before the publication of the its article on Monday, November 5, 2018. Other Teladoc executives also sold stock during the Class Period. For example, Defendant Gorevic sold nearly $15 million worth of stock, while Teladoc's chief legal officer Adam Vandervoort sold about $8.5 million in common stock and stock options.

**Loss Causation**

63. In response to the publication of the SIRF article revealing Hirschhorn's improper relationship and Teladoc's culture of misconduct, Teladoc's stock price fell sharply by $4.00, or 6.69%, to close at $55.81 on December 6, 2018. The SIRF article, SEC filings, CBCE, the above-referenced police report(s), and Teladoc's internal memoranda are incorporated herein by reference.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

64. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Teladoc securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

65. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Teladoc securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Teladoc or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

68. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Teladoc;

- whether the Individual Defendants caused Teladoc to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Teladoc securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

70. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Teladoc securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Teladoc securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

73. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

74. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of

Teladoc securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Teladoc securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Teladoc securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Teladoc finances and business prospects.

77. By virtue of their positions at Teladoc, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of Teladoc, the Individual Defendants had knowledge of the details of Teladoc internal affairs.

79. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Teladoc. As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Teladoc businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Teladoc securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Teladoc business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Teladoc securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

80. During the Class Period, Teladoc securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Teladoc securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs

and the Class, the true value of Teladoc securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Teladoc securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

81. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

83. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84. During the Class Period, the Individual Defendants participated in the operation and management of Teladoc, and conducted and participated, directly and indirectly, in the conduct of Teladoc business affairs. Because of their senior positions, they knew the adverse non-public information about Teladoc misstatement of income and expenses and false financial statements.

85. As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Teladoc

financial condition and results of operations, and to correct promptly any public statements issued by Teladoc which had become materially false or misleading.

86. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Teladoc disseminated in the marketplace during the Class Period concerning Teladoc results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Teladoc to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Teladoc within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Teladoc securities.

87. Each of the Individual Defendants, therefore, acted as a controlling person of Teladoc. By reason of their senior management positions and/or being directors of Teladoc, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Teladoc to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Teladoc and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

88. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Teladoc.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: May 20, 2019

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Joshua L. Crowell*
Lionel Glancy
Robert V. Prongay
Joshua Crowell
Stan Karas
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (301) 201-9150
Fax: (301) 201-9160
Email: lglancy@glancylaw.com
rprongay@glancylaw.com
jcrowell@glancylaw.com
skaras@glancylaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com
Email: jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Plaintiffs***

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On May 20, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 20, 2019.

*s/ Joshua L. Crowell*
Joshua L. Crowell