USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 09/04/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JON REINER, et al.,

Plaintiffs,

-against-

TELADOC HEALTH, INC., JASON GOREVIC, and MARK HIRSCHHORN,

Defendants.

18-CV-11603 (GHW) (BCM)

**REPORT AND RECOMMENDATION TO THE HON. GREGORY H. WOODS**

**BARBARA MOSES, United States Magistrate Judge.**

Lead plaintiffs Wayne Arcuri, Badruddin Salimbhai, and David Williams, suing on behalf of themselves and all others similarly situated, allege that defendants Teladoc Health, Inc. (Teladoc or the Company), Jason Gorevic, and Mark Hirschhorn engaged in securities fraud from March 3, 2016 through December 5, 2018. Now before me for report and recommendation is defendants' motion (Dkt. No. 46) to dismiss the Second Amended Consolidated Class Action Complaint (SAC) (Dkt. No. 35) pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, *et seq*. (PSLRA), on the grounds that (a) plaintiffs have failed to allege any false or misleading statement by any defendant, and (b) plaintiffs have failed to plead facts supporting a strong inference of scienter. For the reasons that follow, I conclude that defendants are correct on the first point, recommend that their motion be granted on that basis, and do not reach the second.

## I. BACKGROUND

### A. Overview

This action had its genesis in what plaintiffs call an "inappropriate relationship," SAC ¶ 6, between defendant Hirschhorn, who was then Teladoc's Executive Vice President (EVP) and Chief Financial Officer (CFO), and a more junior Teladoc employee, nonparty Charece Griffin. What began as an extramarital affair in 2014 allegedly progressed to "potentially illegal insider trading,"

*id.* ¶ 28, complaints of favoritism by other employees, a "whistleblower" memo by Griffin's supervisor in October 2016, shortly after Hirschhorn was named the Company's Chief Operating Officer (COO), *id.* ¶ 12, and an outside investigation, followed by "two minor slaps on the wrist" for Hirschhorn in December 2016. *Id.* ¶ 10. The whistleblower was fired a year later, in October 2017, and was replaced by a less qualified manager whose misconduct ultimately led (after another two years) to the downgrading of the Company's credentialing status. *Id.* ¶ 53. Meanwhile, Griffin "resigned quietly." *Id.* ¶ 44. Hirschhorn remained ensconced in the executive suite until December 5, 2018, when the Southern Investigative Research Foundation (SIRF) (now known as the Foundation for Financial Journalism, *see* https://ffj-online.org/about-us/ (last visited September 4, 2020)) published an expose of the Hirschhorn-Griffin affair and its aftermath (the SIRF Report). The following day, the price of Teladoc's common stock dropped by approximately 6.7%, and on December 17, 2018, Hirschhorn resigned "amid . . . accusations of misconduct." SAC ¶ 14.

According to plaintiffs, the Company and two of its senior executives – Chief Executive officer (CEO) Gorevic and Hirschhorn himself – violated § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, from March 3, 2016 through December 5, 2018 (the Class Period), by making statements in the Company's filings with the Securities and Exchange Commission (SEC) and elsewhere that (a) "touted" Teladoc's Code of Business Conduct and Ethics (CBCE), which supposedly applied to all employees, including senior executives, while concealing the facts about Hirschhorn's misconduct and the Company's anemic response, which, plaintiffs say, "establish that the CBCE was a dead letter and that Defendants' representations were materially misleading," *see* Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss (Pl. Mem.) (Dkt. No. 50) at 10; and (b) acknowledged its dependence on its senior management team while omitting "the significant

personnel issues arising from Hirschhorn's misconduct," including that he could be terminated or resign, and that "significant employment-related litigation" could ensue. *Id*. at 19. Plaintiffs further assert that large sales of Teladoc stock by Gorevic, Hirschhorn, and a third Teladoc officer throughout the alleged class period, including a $700,000 sale by Hirschhorn on November 2, 2018 (which plaintiffs mistakenly describe as "just before" the publication of the SIRF Report, SAC ¶ 81) raise "a strong inference that Defendants acted with the fraudulent intent or the conscious recklessness required to plead scienter." Pl. Mem. at 23. Based on the same conduct, plaintiffs allege that the individual defendants, who controlled the content of the SEC filings and other statements at issue, are liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t.

Defendants, for their part, argue that the Company's public disclosures about the CBCE, and about its general commitment to ethical corporate governance, were "aspirational" statements that did not purport to guarantee ethical behavior by all employees at all times and were not rendered materially misleading by the "alleged misconduct of a single executive" whom plaintiffs believe to have been insufficiently punished for his misdeeds. Memorandum of Law in Support of Defendants' Motion to Dismiss (Def. Mem.) (Dkt. No. 47) at 12. Similarly, defendants contend, their statements regarding the Company's dependence on its key personnel – including Hirschhorn – were neither false on their face nor suggested that no improper activity was occurring, and therefore were not rendered misleading by the failure to specifically disclose that Hirschhorn had committed misconduct that could lead to his termination or resignation, or to employment-related litigation. *Id*. at 20-22. As for the executive stock sales, defendants assert that none of the trading was "unusual or suspicious," and that many of the sales were made at disadvantageous prices, or

pursuant to 10b5-1 trading plans (including Hirschhorn's $700,000 sale on November 2, 2018),[1] thus further undercutting any inference of scienter. *Id.* at 27-32.

### B. Procedural Background

Plaintiff Jon Reiner commenced this action on December 12, 2018, seven days after the SIRF Report was published, on behalf of himself and all others who purchased or otherwise acquired Teladoc securities between March 3, 2016 and December 5, 2018, against Teladoc, Gorevic, and Hirschhorn. Compl. (Dkt. No. 1) ¶¶ 1-8. On March 7, 2019, the Hon. Gregory H. Woods, United States District Judge, granted the unopposed motion of Arcuri, Salimbhai, and Williams to be appointed Lead Plaintiffs. (Dkt. No. 25.) On May 20, 2019, the Lead Plaintiffs filed an Amended Consolidated Class Action Complaint (Dkt. No. 29), and on June 25, 2019, after obtaining leave (Dkt. No. 34), they filed the SAC, which remains their operative pleading. On September 13, 2019 – the same day defendants filed their motion to dismiss – Judge Woods referred this action to me for general pretrial management and report and recommendation on dispositive motions. (Dkt. No. 45.)

Defendants' motion is supported by their memorandum of law and by the declaration of their attorney Audra J. Soloway (Soloway Decl.) (Dkt. No. 48), attaching, for the most part, documents that were filed by defendants and other Teladoc officers with the SEC. On October 25, 2019, the Lead Plaintiffs filed their memorandum in opposition to the motion to dismiss, and on November 27, 2019, defendants filed a reply memorandum (Def. Reply Mem.) (Dkt. No. 53). After accepting a series of supplemental letter-briefs (Dkt. Nos. 54, 55, 58, 59, 61), I heard oral

---

[1] SEC Rule 10b5-1 creates a defense to insider trading for individuals who purchase or sell securities pursuant to a predetermined, written plan. 17 C.F.R. § 240.10b5-1(c).

argument on the motion to dismiss on May 15, 2020. *See* Tr. of May 15, 2020 Tel. Conf. (Tr.) (Dkt. No. 63).

### C. Factual Allegations[2]

Teladoc is a Delaware corporation, headquartered in Purchase, New York, providing "telehealth services worldwide." SAC ¶ 2. Its stock trades on the New York Stock Exchange. *Id.* ¶¶ 3, 20. Defendant Gorevic served, at all relevant times, as the company's CEO. *Id.* ¶ 21. Defendant Hirschhorn became the company's EVP and CFO in October 2012, and obtained the COO title on September 28, 2016. *Id.* ¶¶ 14, 22, 26.

#### 1. Before and During the Class Period

In May 2014, defendant Hirschhorn began a sexual relationship with Griffin, who worked in the "credentialing unit" in the Company's Lewisville, Texas office. SAC ¶¶ 4, 29, 30, 46. Thereafter, Griffin "received a series of promotions over colleagues with either more industry experience or better credentials that stunned her former colleagues," and her annual compensation grew to "about $125,000." *Id.* ¶ 13. No further details are pleaded about Griffin's promotions or compensation.

The affair spanned at least two years, *id.* ¶ 31, and was apparently an open secret in the Lewisville office, where Griffin "regularly discussed her relationship with Hirschhorn." *Id.* ¶¶ 5, 30-33. Griffin told her colleagues, among other things, that the couple "liked to trade Teladoc stock together," *id.* ¶¶ 5, 28, and disclosed that Hirschhorn gave her $10,000 with which to buy stock,

[2] As required by *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007), the well-pleaded allegations contained in the SAC are accepted as true for purposes of the motion to dismiss.

as well as advice on "good opportunities to sell some shares" after she received a stock grant. *Id.* ¶¶ 5, 28, 33. No further details are pleaded concerning the couple's alleged stock trading.

On September 28, 2016, Hirschhorn was promoted to COO. SAC ¶ 8.

By October 2016, Amy McKay, who was Teledoc's Clinical Director and Griffin's "ultimate boss," had heard about the relationship between Hirschhorn and Griffin from "disgruntled employees" who made "widespread complaints of unfairness in connection with Griffin's stock trades." SAC ¶ 6. McKay "drafted an eight-page document that set forth a timeline of Hirschhorn and Griffin's relationship and detailed the complaints of unfairness in connection with Griffin's stock trades that other employees raised," which she submitted "to both the Legal and Human Resources [HR] departments of Teladoc." *Id.* ¶ 35. No further details are pleaded concerning the contents of McKay's memo. McKay also "reported the improper relationship to Pina Tripodi and Theresa Kirk-Fowler, Teladoc's Director and Associate Director of Human Resources, respectively," as did another, unnamed, Teladoc employee. *Id.* ¶ 34.[3]

Beginning in early October 2016, several Teladoc employees, including McKay, received harassing emails from fake email addresses. SAC ¶¶ 7, 37. One employee forwarded the emails to Kirk-Fowler, and two filed police reports – at Kirk-Fowler's suggestion – detailing emails received on October 2 and 9, 2016, respectively. *Id.* ¶¶ 7-8, 38-40 & Exs. B-C. In their police reports, these employees suggested that Griffin was the sender of the emails, but did not assert – as plaintiffs do here – that that the emails were "related" in any way to the recipients' "awareness of the affair

[3] It is not clear from the SAC exactly when McKay learned of the relationship or exactly when she submitted her memo. It is also unclear whether McKay's report to Tripodi and Kirk-Fowler was separate from her memo and, if so, when that separate report occurred.

between Hirschhorn and Griffin." SAC ¶ 7.[4] After interviewing Griffin (*id*. Ex. C), the police closed both cases, "finding no grounds for a criminal violation." *Id*. ¶ 41.

In November 2016, Teladoc's Chief Legal Officer, Adam Vandervoort, came to the Lewisville office to interview McKay, SAC ¶ 36, and McKay learned that the Company had retained an outside law firm to investigate her allegations. *Id*. ¶¶ 9, 42. Although the law firm’s investigation substantiated those allegations and "revealed inappropriate conduct" by Hirschhorn, *id*. ¶¶ 10, 42-43, defendants "failed to act to ensure that investors would not be harmed." *Id*. ¶¶ 10, 43. Instead, on December 27, 2016, Teladoc entered into an amended employment contract with Hirschhorn containing two "minor slaps on the wrist," in the form of (a) a prohibition on violating the "employee handbook," and (b) a one-year suspension of the scheduled share vesting awarded to him as part of his compensation. *Id*. ¶¶ 10, 43.[5]

In October 2017, approximately one year after she submitted her eight-page memo to HR and Legal, McKay "was fired," SAC ¶¶ 13, 44, after spending "months 'bitterly complaining and

[4] One employee declined to name "the person she feels is sending the emails at this time, in case it's not really that person," but told the police that the sender "is 'sleeping with' one of the supervisors, so the company is just going to 'sweep this under the rug.'" SAC Ex. B. The other employee told the police that she suspected Griffin, who "used to work for her" but was transferred to another department, after which Griffin became "very angry." *Id*. Ex. C. There is no indication that this employee said anything to the police about the Hirschhorn-Griffin affair. *Id*.

[5] This appears to be an incomplete description of the amended employment contract and of the Company's response to Hirschhorn's misconduct. The amended contract, filed with the SEC, conditioned Hirschhorn's annual bonus on his not having "materially violated any published employee policy of the Company." Soloway Decl. Ex. 1, at ECF page 5. Thereafter, the Company reported that Hirschhorn did not receive any annual bonus for 2016. *Id*. Ex. 3, at 8-10. The Company did not, however, publicly report the reason for the amended contract or the forfeited bonus. *See* Tr. at 8:8-18.

arguing with the HR and Legal departments'" about "the Hirschhorn decision." *Id.*[6] Griffin "resigned quietly in late 2017," *id.*, with a severance package. *Id.* Ex. A (SIRF Report) at 4-5.

After Hirschhorn received his amended employment contract, he retained his position at Teladoc for another two years, until the publication of the SIRF Report (upon which the SAC is largely based, and which it incorporates) on December 5, 2018. SAC ¶¶ 5, 28; *id.* Ex. A. The next day, Teladoc's stock price fell by $4.00, or 6.69%, closing at $55.81. *Id.* ¶¶ 13, 82. Hirschhorn resigned on or about December 17, 2018. *Id.* ¶ 14.

**2. After the Class Period**

In the wake of the SIRF Report, Teladoc's CEO, Gorevic, told analysts that Teladoc was not aware of the inappropriate relationship between Hirschhorn and Griffin when Hirschhorn was promoted to COO on September 28, 2016, and that McKay was not terminated for reporting the relationship. SAC ¶ 54. These statements, according to plaintiffs, were false. *Id.* ¶¶ 54-55.[7]

Meanwhile, McKay was replaced by Suzanne Leary, who "had zero experience with credentialing doctors." SAC ¶ 49. Leary's team "resorted to falsifying documents," *id.* ¶¶ 49-50, which in turn prompted the National Committee for Quality Assurance (NCQA) – which "provides accreditation to healthcare companies" – to conduct a "lengthy audit," after which, on May 15, 2019, NCQA "placed Teladoc on 'under corrective action' status. *Id.* ¶¶ 47, 51, 53. This put Teladoc

[6] In addition, according to plaintiffs, the unnamed employee who, along with McKay, reported Hirschhorn's improper relationship to HR in 2016 "experienced retaliation, in the form of bullying, and then was ultimately fired," in 2018, "by a manager who reported to Hirschhorn." SAC ¶ 45.

[7] Plaintiffs reason that since the "email harassment" against McKay and other Teladoc personnel "began no later than October 2, 2016," and since it occurred "in response to" McKay having reported the relationship to senior management, it is "highly unlikely" that senior management was ignorant of the affair on September 28, 2016. SAC ¶ 55. As to McKay, plaintiffs explain that her "ouster," as reported by SIRF, as well as the police report she filed a year earlier, "belie Gorevic's representation that [she] left voluntarily." *Id.* ¶ 56.

at a competitive disadvantage against other telehealth businesses, like Doctors on Demand and MD Live, which are "accredited without qualification." *Id.* ¶ 53; *see also id.* ¶ 48 ("Defendants considered NCQA accreditation to be a significant selling point to payors and investors, as demonstrated by the fact that Teladoc's Form 10-Ks filed before 2019 touted [its] accreditation" and Teladoc "represented that it was the first telehealth company to achieve NCQA certification.").

### 3. Stock Trades

During the Class Period, Hirschhorn "sold or exercised Teladoc stock options equivalent to 275,000 shares for proceeds of almost $8 million." SAC ¶ 81. Through November 2, 2018, Hirschhorn "sold another 265,000 shares (nearly 99% of what he held in January of that year) for approximately $13 million," including more than $700,000 from a sale on November 2, 2018. *Id.*[8] Gorevic sold nearly $15 million worth of stock during the Class Period, while Vandervoort – who is not a defendant – sold "about $8.5 million in common stock and stock options." *Id.* No further details are pleaded concerning the executive stock sales.

## D. Defendants' Statements

During the Class Period, the Company made a number of public statements about its "integrity" and "ethics," frequently highlighting its CBCE. For example, in an April 15, 2016 proxy statement (the 2016 Proxy), Teladoc stated that it was "committed to the highest standards of integrity and ethics in the way it conducts business." SAC ¶ 60. The 2016 Proxy went on to state

[8] The SIRF Report, upon which these allegations appear to be based, states that the first 275,000 shares were sold through a Rule 10b5-1 plan. SAC Ex. A, at 4. As for the $700,000 worth of shares sold on November 2, 2018, this was not "just before" the publication of the SIRF report, which according to its byline was published on December 5, 2018. *Id.*; *see 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*, 96 F. Supp. 3d 182, 199 (S.D.N.Y. 2015) (where documents attached to a complaint contradict the allegations about those documents contained therein, the documents control).

that the CBCE, adopted in 2015, "applies to all of our employees, officers and directors, including our chief executive officer, chief financial officer, and all other executive and senior officers." *Id.* ¶ 61. Teladoc described the CBCE as "establish[ing] our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest," and noted that, "[u]nder our Code of Business Conduct and Ethics, each of our directors and employees is required to report suspected or actual violations." *Id*. Similar statements were made in a 2017 proxy statement, a 2018 Form 10-K, and a 2018 proxy statement. *Id*. ¶¶ 68-78.

Teladoc further "touted" its CBCE by directing readers to the Company's website, where a copy was available. SAC ¶¶ 62, 72, 78. The CBCE itself (SAC Ex. D) states, in § 1:

> We must strive to foster a culture of honesty and accountability. Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, customers, suppliers, competitors, the government and the public, including our shareholders. All of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior. Even well-intentioned actions that violate the law or this Code may result in negative consequences for the Company and for the individuals involved. One of our Company's most valuable assets is our reputation for integrity, professionalism and fairness. We should all recognize that our actions are the foundation of our reputation and adhering to this Code and applicable law is imperative.

In § 3, the CBCE advises that "[u]sing non-public, Company information to trade in securities, or providing a family member, friend or any other person with a 'tip', is illegal." In § 5, the CBCE states that "[a]ll employees, officers and directors should avoid situations that present a potential or actual conflict between their interest and the interest of the Company," and explains that a conflict of interests occurs "when a person's private interest interferes in any way, or even appears

to interfere, with the interest of the Company." Section 12 of the CBCE addresses discrimination, stating:

> The Company's policies for recruitment, advancement and retention of employees forbid discrimination on the basis of any criteria prohibited by law, including but not limited to race, sex and age. Our policies are designed to ensure that employees are treated, and treat each other, fairly and with respect and dignity. In keeping with this objective, conduct involving discrimination or harassment of others will not be tolerated. All employees are required to comply with the Company's policy on equal opportunity, non-discrimination and fair employment, copies of which were distributed and are available from the Legal Department.

According to plaintiffs, all of these statements were materially misleading because defendants failed to disclose that:

> (i) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (iv) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct. In other words, Griffin was promoted in stark contradiction of Company policy, despite the Company falsely touting its purported fairness. Hirschhorn's conduct also violated Company policy, and Defendants failed to disclose these violations.

SAC ¶¶ 67, 69, 73, 75, 80.[9]

Defendants also made statements, during the Class Period, about "the reliability and personal ethics of its key executives." SAC ¶ 57. In a 2015 Form 10-5, the Company stated:

---

[9] The SAC repeatedly alleges that the relationship between Hirschhorn and Griffin was "inappropriate" or "improper." It is not clear, however, what provision of the CBCE plaintiffs contend to have been violated by the relationship. To be sure, the CBCE prohibits insider trading, SAC ¶ 11, and plaintiffs allege, in conclusory terms, that Hirschhorn and Griffin engaged in "insider trading." *E.g.*, SAC ¶¶ 4, 12, 59, 67, 69, 73, 75; *see also id*. ¶ 28 ("potentially illegal insider trading"). However, the factual allegations set forth in the SAC cannot fairly be read to make out that charge. Plaintiffs nowhere allege, for example, that Hirschhorn disclosed or used any "material, nonpublic information" – the *sine qua non* of the offense, *see United States v. O'Hagan*, 521 U.S. 642, 652 (1997) – when giving Griffin investment advice.

> We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business.

SAC ¶ 57. Teladoc went on to state that "changes in our executive management team" could "disrupt our business." *Id*. It also noted that "employment claims made by [the Company's] current or former associates . . . may result in substantial costs and may divert management's attention and resources." *Id.* ¶ 58.

According to plaintiffs, these "key personnel" statements were also materially false and misleading, because they failed to disclose that:

> (i) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (ii) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (iii) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (iv) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct. In other words, the Company, promoted the competence and experience of its executives, while it was actually or constructively aware of the pervasive violations of the Company's policies. The Company further failed to disclose that one of its executives has been violating such policies, and was at risk of losing his job (which would adversely affect the Company's operations) for his misconduct.

SAC ¶ 59.

## II. ANALYSIS

### A. Legal Standards

#### 1. Rule 12(b)(6)

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." If that "short and plain statement" fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

When faced with a Rule 12(b)(6) motion, the tcourt must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy*, 482 F.3d at 191. However, those factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court may not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "As the Court held in *Twombly*, the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Geldzahler v. New York Med. Coll.*, 663 F. Supp. 2d 379, 385 (S.D.N.Y. 2009).

In resolving a motion to dismiss under Rule 12(b)(6), "[i]n addition to the facts alleged in the complaint, courts 'may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.'" *Alpha Capital Anstalt v. Schwell Wimpfheimer & Associates LLP*, 2019 WL 1436993, at *6 (S.D.N.Y. Mar. 30, 2019) (Woods, J.) (quoting *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

**2. Rule 9(b) and the PSLRA**

Plaintiffs asserting claims for securities fraud must also satisfy the heightened pleading requirements imposed by the PSLRA and Fed. R. Civ. P. 9(b). *Alpha Capital*, 2019 WL 1436993, at *6 ("Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA."); *ATSI*, 493 F.3d at 99. Under Rule 9(b), plaintiffs alleging fraud "must state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99; *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

"The PSLRA imposes similar requirements on claims brought under the Exchange Act: 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Alpha Capital*, 2019 WL 1436993, at *6 (quoting 15 U.S.C. § 78u-4(b)(1)). "The PSLRA further requires that the complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' with respect to each alleged misstatement or omission." *Id*. (quoting 15 U.S.C. § 78u-4(b)(2)(A)). In a Rule 10b–5 action, the "required state of mind" is an "intent to deceive, manipulate, or defraud," or "reckless conduct." *ATSI*, 493 F.3d at 99 n.3 (citations and quotation marks omitted). "A complaint will survive under that heightened standard 'only if a reasonable person would deem the inference of scienter cogent

and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Alpha Capital*, 2019 WL 1436993, at *6 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

### 3. Section 10(b) of the Exchange Act and Rule 10b-5

"To sustain a private cause of action for securities fraud under section 10(b) and Rule 10b-5, [plaintiffs] must adequately plead: (1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GE Investors v. General Elec. Co.*, 447 F. App'x 229, 231 (2d Cir. 2011) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). A fact is material if it "would have been viewed by the reasonable investor as having significantly altered the total mix of information available," *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quotation omitted); that is, if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (quotation omitted). "The statement must also be 'mislead[ing],' evaluated not only by 'literal truth,' but by "context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)).

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see also DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, 323. F. Supp. 3d 393, 434 (S.D.N.Y. 2018) (Woods, J.) ("A corporation does not have a duty to disclose information simply because it is

material."). However, "[w]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (*quoting Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987)). This rule applies in full to "disclosure of a company's violations of its internal code of conduct" or other misconduct, which "is generally not required unless its absence renders any particular statement false or misleading." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *7 (S.D.N.Y. Apr. 14, 2020) (Woods, J.). "Based on this principle, courts presented with the specific context here – of undisclosed corporate malfeasance or allegations of the same – have held that disclosure was not required except where doing so was necessary to prevent the corporation's *other* statements from being misleading." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (emphasis in the original) (collecting cases).

"Statements that are too vague or general to be relied upon – puffery – are, by definition, not material." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 531 (S.D.N.Y. 2020). In most cases, "general statements about reputation, integrity, and compliance with ethical norms" fall into this category, particularly where "the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). *See also ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (defendant's statements regarding its "discipline" and "integrity" were "too general to cause a reasonable investor to rely upon them," did not "amount to a guarantee that its choices would prevent failures in its risk management practices," and therefore were "no more than 'puffery,' which does not give rise to securities violations").

**4. Section 20(a) of the Exchange Act**

Section 20(a) imposes liability on "control persons" – those who, "directly or indirectly, control[ ] any person liable under" the Exchange Act. 15 U.S.C. § 78t(a). To state a claim under § 20(a), a plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. "If a plaintiff has not adequately alleged a primary violation – that is, a claim under another provision of the Exchange Act – the derivative Section 20(a) claim must fall." *Oklahoma Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 558-59 (S.D.N.Y. 2020).

**B. Plaintiffs Fail to Allege any Material Misstatement or Omission**

Plaintiffs' primary contention, as noted above, is that defendants' statements "touting" the Teladoc CBCE were rendered materially misleading by the failure to disclose Hirschhorn's violations of that CBCE and the Company's "eyebrow raising response," which revealed that it was unable or unwilling to prevent – or adequately redress – ethical violations by one of its highest ranking executives. Pl. Mem. at 10-11. Plaintiffs also take aim at Teladoc's "key personnel" disclosures, arguing that once the Company "decided to broach the subjects" of executive retention and employment litigation, it was "obligated to provide the complete picture," including by disclosing the "significant personnel issues" arising from Hirschhorn's undisclosed misconduct. *Id.* at 20.

I address each category in turn.

**1. Statements Regarding the CBCE and Corporate Governance**

"Corporate codes of conduct tend to be 'general statements about reputation, integrity, and compliance with ethical norms [that] are inactionable puffery' – as opposed to being statements of

facts – and are, therefore, generally incapable of forming the basis for a Section 10(b) claim." *CBS*, 433 F. Supp. 3d at 532 (quoting *Singh*, 918 F.3d at 63); *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 658 (S.D.N.Y. 2017) (Woods, J.) (Banco Bradesco's Code of Ethical Conduct was not actionable because, "despite its relatively forceful wording," it remained "an aspirational and hortatory statement" that "made no guarantee that it would be followed" and contained no "representations of historical fact to the effect that its officers had uniformly abided by it"). Therefore, [c]ourts have allowed claims based on alleged misrepresentations contained in a code of ethics or conduct to survive a motion to dismiss only in rare circumstances." *Papa John's*, 444 F. Supp. 3d at 560 (S.D.N.Y. 2020); *accord*, *CBS*, 433 F. Supp. 3d at 532.

Those circumstances are not present here. Teledoc's statements that it was "committed" to the "highest standards of integrity and ethics," SAC ¶ 60, *see also id*. ¶¶ 70, 76, are precisely the type of "standard and vague assurances" that the courts routinely find too insubstantial to be the basis of a securities fraud claim, because "no reasonable investor could have relied" on them. *Papa John's*, 444 F. Supp. 3d at 560 ("hazy" statements about company's "continuous commitment to enhance culture and quality" were not actionable). *See also Singh*, 918 F.3d at 63 (statements amounting to "general declarations about the importance of acting lawfully and with integrity" fall "squarely within" the category of inactionable puffery); *City of Brockton Retirement System v. Avon Products, Inc.*, 2014 WL 4832321, at *16 (S.D.N.Y. Sep. 29, 2014) (statements regarding company's "commitment" to legal and ethical compliance are not material where they "offer no assurance that [the company's] compliance efforts will be successful, and do not suggest that [the company's] compliance systems give the [company] a competitive advantages over other companies"); *CBS*, 433 F. Supp. 32d at 533 (CEO's statement that "[w]e are *committed* to

maintaining the highest standards in everything we do" was mere puffery and not actionable) (emphasis in the original).

Moreover, the Teladoc CBCE explicitly uses "aspirational and hortatory" language, *see Banco Bradesco*, 277 F. Supp. 3d at 658, which does not "invite reasonable reliance." *CBS*, 433 F. Supp. 3d at 533. For example, the CBCE exhorted employees to "strive" to foster a culture of honesty, "seek to avoid" the appearance of improper behavior," and "recognize" that "our actions are the foundation of our behavior." CBCE § 1. The same is true of the proxy statements and other SEC filings highlighted in the SAC, which informed investors that the CBCE established the Company's "policies and expectations" with respect to a wide range of business conduct, SAC ¶ 61, and that the "purpose" of the code is to "promote" honest and ethical conduct. *Id.* ¶ 71. None of the language relied on by plaintiffs herein represents – or even suggests – that the CBCE had prevented, or could prevent, unethical conduct by all of the personnel to whom it applied. *See Braskem*, 246 F. Supp. 3d at 756 ("There is an important difference between a company's announcing rules forbidding [misconduct] and its factually representing that no officer has engaged in such forbidden conduct.") Where, as here, the company's statements are "explicitly aspirational," an "undisclosed breach of [the company's] standard of conduct is . . . without more, not actionable under securities laws." *Id.*[10]

One of the "rare circumstances" in which a company's aspirational code of conduct can be deemed materially misleading involves misconduct which is plainly proscribed by the code yet so

[10] Plaintiffs find it significant that the Teladoc CBCE applied to "all of its employees, officers, and directors," including the most senior corporate officers. SAC ¶¶ 11, 27, 61, 66; *see also* Pl. Mem. at 14 (arguing that this language was "nonaspirational"). The Court reads the phrase somewhat differently, as expressing the familiar aspiration that all corporate employees, including the most senior officers, hold themselves to the same ethical standards.

"pervasive" in the workplace as to plausibly demonstrate that the company "in fact, held none of its asserted aspirations." *CBS*, 433 F. Supp. 3d at 533. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *5-7, 17 (S.D.N.Y. Nov. 26, 2018) (*Signet I*) (statements regarding Signet's anti-sexual harassment policies and procedures were actionable where the complaint plausibly alleged a "culture of pervasive sexual harassment," which was "rampant at Signet at all levels, including among senior executives," and which was the subject of a pending arbitration proceeding in which over 200 employees filed declarations "detailing their experiences" with sexual harassment at the company)[11]; *Banco Bradesco*, 277 F. Supp. 3d at 622-23, 659-60 (while Code of Ethical Conduct itself was not actionable, Banco Bradesco's statements "*about* the Code of Ethical Conduct or about the Company's anti-corruption policies and efforts," including its repeated statement that it had adopted an "effective process for preventing and combatting corruption and bribery," could be the basis of a securities fraud claim where the statements were made "in an effort to reassure the investing public about the Company's integrity" in the midst of ongoing, "high-profile" bribery investigations, and where "at least [defendant] Angelotti was fully aware that the policy was not effective, since he was knowingly involved in the scheme to bribe Leite," for which he and two other bank executives were later indicted) (emphasis in the original).

Citing *Signet I* and *Banco Bradesco*, plaintiffs make a vigorous effort to shoehorn the facts of this case into the "pervasive misconduct" exception, arguing that Teladoc's "nonenforcement of the CBCE against one of its most senior executives," while "punishing the whistleblowers,"

[11] *See also In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019) (*Signet II*) (once again refusing to dismiss plaintiffs' claims where the challenged statements were issued "[i]n the face of a credible accusation . . . that Signet suffered from rampant sexual harassment," and were designed to "reassure the investing public," falsely, "that Signet did not, in fact, have a toxic workplace"), *reconsideration denied*, 2019 WL 2656338 (S.D.N.Y. June 20, 2019).

effectively "nullified the CBCE, at least as applied to senior executives." Pl. Mem. at 14-17. That effort fails.

First, this case – unlike *Signet I*, *Signet II*, and *Banco Brandesco* – does not involve serious misconduct "directly at odds with" the prohibitions set forth in the company's code of ethics. *Signet I*, 2018 WL 6167889, at *17. Hirschhorn is not accused of sexual harassment, which was clearly forbidden by the CBCE (as it was by Signet's Code of Conduct and Code of Ethics). Nor is he accused of bribery, which would also violate the CBCE (as it did Banco Bandesco's Code of Ethical Conduct). Moreover, while his relationship with Griffin may have been "inappropriate," plaintiffs struggle to identify the CBCE provision(s) actually violated.[12]

Second, "context matters." *Signet II*, 389 F. Supp. 3d at 230; *see also Singh*, 918 F.3d at 63. In this case – unlike *Signet I*, *Signet II*, and *Banco Brandesco* – there is no allegation that defendants' statements were made "to reassure investors that nothing was amiss when faced with suspicions of internal malfeasance." *CBS*, 433 F. Supp. 3d at 532. *Cf. In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company").

---

[12] It could be argued that a sexual relationship between a senior Teledoc officer and a significantly more junior Teladoc employee is inherently "improper," CBCE § 1, or presents a "potential or actual conflict" for one or both partners. *Id*. § 5. However, nothing in the CBCE expressly proscribes such relationships, and there is no allegation that the affair was non-consensual or that either Hirschhorn or Griffin engaged in any form of sexual harassment. The CBCE does, of course, forbid "[u]sing non-public, Company information to trade in securities" or "tip" another person, *id*. § 3, but, as noted above, plaintiffs never allege that either Hirschhorn or Griffin traded on non-public information. To the extent, therefore, that plaintiffs rely on Hirschhorn's "insider trading" to "explain why the statements [in the CBCE] were fraudulent," *ATSI*, 493 F.3d at 99, as required under Rule 9(b), their allegations are too "threadbare," *Iqbal*, 556 U.S. at 678, to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Third, plaintiffs' characterization of the facts – particularly with regard to Teladoc's "nonenforcement" of its ethical standards – is not wholly consistent with the facts alleged in the SAC. For example, in their opposition brief, plaintiffs describe the CBCE as a "dead letter" in light of Hirschhorn's "serious violations" and defendants' "eyebrow-raising response" when "whistleblowers reported Hirschhorn's violations to other member of senior management," which consisted of "promot[ing]" him to COO while "push[ing] the whistleblowers out of the company." Pl. Mem. at 11. As defendants note, this is a somewhat "fictional version of the SAC," Def. Reply Mem. at 10, which gets events out of order (Hirschhorn was promoted before McKay wrote her eight-page memo) and omits inconvenient facts (Teladoc took McKay's memo seriously, retained an outside law firm to "conduct an investigation of her allegations," SAC ¶ 42, amended Hirschhorn's employment contract to delay a financial benefit, and denied him a cash bonus). Hirschhorn may have been insufficiently punished, in plaintiffs' eyes, but he was not uninvestigated, nor entirely unpunished. Moreover, while plaintiffs do allege that McKay was "fired," an entire year passed between her "whistleblower" memo and her termination, which is somewhat inconsistent with plaintiffs' speculation that she lost her job as "retaliation" for that memo, or as part of a plot to "punish[] the whistleblowers." *Id.* at 13.[13]

[13] The allegations as to the second alleged whistleblower, identified in the SAC only as a former employee (FE2), are even thinner. There is no allegation that FE2 received "harassing emails" or otherwise experienced any adverse treatment plausibly related to the report that he or she made in 2016. Moreover, FE2 remained at Teledoc until January 2018. SAC ¶ 31. As to FE2, the retaliation claim is based on plaintiffs' vague allegation that FE2 experienced "bullying" – of what sort, by whom, and over what period of time is not disclosed – and was ultimately fired "by a manager who reported to Hirschhorn." *Id.* ¶ 45. The Court notes that Hirschhorn was by then the COO of Teladoc, which likely made *every* Teladoc manager his direct or indirect report. At least as to FE2, therefore, plaintiffs' allegations that he or she was "pushed out of the company" in retaliation for whistleblowing are simply not "plausible." *Iqbal*, 556 U.S. at 678.

Read fairly, plaintiffs' fraud allegations – based on defendants' failure to disclose a single "inappropriate" (but consensual) relationship, conducted by a single executive, who was more lightly disciplined than plaintiffs believe he should have been – simply do not add up to the kind of "widespread" and "pervasive" misconduct, or willful corporate blindness, alleged in *Signet I*, *Signet II*, and *Banco Brandesco*. *See CBS*, 433 F. Supp. 3d at 535 (noting that in *Signet I* the company "took no action at all in the face of blatant and pervasive violations" of its code of ethics, but those "are not the allegations here"). Indeed, the misconduct here is less egregious than in *CBS*, which arose out of the disclosure that Les Moonves, the long-time CEO of CBS, had "a dark history of sexual misconduct and fostered a hostile work place culture that posed material business risks for the Company." 433 F. Supp. 3d at 525. CBS's senior leadership concealed that "dark history" for years, "all the while paying lip service to the Company's purported anti-harassment ethical standards," *id*., until Moonves's misdeeds were uncovered by the press, which caused an immediate drop in the price of CBS stock, followed (some months later) by Moonves's termination "for cause." *Id*. at 529, 537.

Judge Caproni evaluated the allegations concerning Moonves against the CBS Business Conduct Statement (BCS), which assured investors that "CBS has a zero tolerance policy for sexual harassment, and that CBS would take all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware." *CBS*, 433 F. Supp. 3d at 528 (internal quotation marks omitted). The company also stated that it would "promptly and thoroughly investigate allegations of sexual harassment," and that "those who reported harassment would not be retaliated against." *Id*. at 534. Notwithstanding this relatively strong language (which includes assurances that Teladoc never made), Judge Caproni dismissed plaintiffs' claims arising out of the BCS and related statements, holding that the challenged statements were general and aspirational,

and that "the alleged misconduct, although reprehensible," was not "so pervasive that the Amended Complaint has plausibly alleged that CBS, in fact, held none of its asserted aspirations." *Id*. at 533. So too here. Plaintiffs' claims arising out of Teladoc's CBCE should be dismissed.

**2. Statements Regarding Key Personnel**

"Risk disclosures," including disclosures concerning the risk of losing the services of a senior executive, or being the target of employment litigation, "are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that the risk has already materialized." *CBS*, 433 F. Supp. 3d at 536 (collecting cases). However, "[d]isclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac*, 752 F.3d at 184 (citations and quotation marks omitted). Thus, "[a]llegations that defendants concealed corporate mismanagement or uncharged criminal conduct are not actionable unless the non-disclosures render other statements by defendants misleading." *Fries v. Northern Oil and Gas, Inc.*, 285 F. Supp. 3d 706, 718-19 (S.D.N.Y. 2018).

In making the determination as to whether specific risk disclosures were required, "courts must consider whether the omitted mismanagement or uncharged criminal conduct is 'sufficiently connected to defendants' existing disclosures.'" *Fries*, 285 F. Supp. 3d at 719. (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (citations omitted)). If the "existing disclosures" merely state that an executive is important to a company, there is no need to discuss whether that executive might lose his position due to conduct which is not yet publicly known. Thus, in *CBS*, Judge Caproni held that the company's "Risk Disclosures were not misleading" because they "stated simply that Moonves was important to CBS. They have nothing to do with Moonves's alleged misconduct. They did not state or suggest that Moonves had always behaved appropriately, nor did they purport to assess the likelihood that he would leave the Company or be

implicated in accusations of misconduct. In short, they neither stated nor implied anything that was untrue." *CBS*, 433 F. Supp. 3d at 538.

In *Papa John's*, the company noted that "name and likeness" of the company's CEO, John Schnatter, were "central to the Papa John's brand," and discussed "the harms that would result if Schnatter's role or reputation were compromised." 444 F. Supp. 3d at 562. After those statements were made, Schnatter resigned, following an incident in which he used "the N-word" during what was supposed to be a sensitivity training exercise. *Id*. at 556. Within weeks, a series of magazine articles were published that "described disturbing instances of workplace sexual harassment and misconduct, perpetrated by and with the tacit permission of senior executives, including Schnatter," who personally engaged in "sexually inappropriate conduct" over a period of years that resulted in "at least two confidential settlements." *Id*. After "news of the toxic culture" broke, the company's stock price dropped, and the board of directors adopted a "poison pill" to prevent Schnatter from gaining a controlling interest. *Id*. at 557. Notwithstanding these fairly lurid facts, Papa John's investors were unable to plead a securities fraud claim premised on the failure to disclose Schnatter's unadjudicated misconduct as a "risk factor." *Id*. at 562. As Judge Wood explained, "[s]tatements regarding Schnatter's importance to the Company were not misleading for having omitted unadjudicated allegations that might one day lead to his ouster." *Id*. at 563.

Here, as in *CBS* and *Papa John's*, plaintiffs argue that Hirschhorn's misconduct created a tangible risk that his misdeeds would be uncovered and that he would be forced out, or that the Company would be sued by other employees unhappy about Hirschhorn's conduct, requiring prophylactic disclosure of those facts in Teladoc's general discussion of its key personnel. Pl. Mem. at 20. Teladoc's risk disclosures, however, did not even mention Hirschhorn by name, did not "state or suggest that [Hirschhorn] had always behaved appropriately," and did not "purport to assess the

likelihood that he would leave the Company or be implicated in accusations of misconduct." *CBS*, 433 F. Supp. 3d at 538. Absent any of these features, Teladoc's risk disclosures were "not misleading for having omitted unadjudicated allegations that might one day lead to his ouster." *Papa John's*, 444 F. Supp. 3d at 563.[14]

### C. Scienter

Because plaintiffs have failed to plead any actionable misstatement or omission, the Court need not reach the question of scienter. *See Singh*, 918 F.3d at 62 ("Because we agree with the District Court regarding the absence of a material, false statement, we need not reach the issue of scienter."); *Papa John's*, 444 F. Supp. 3d at 564 ("Because the Court holds that Plaintiff has not adequately pled a material misrepresentation or omission under Section 10(b) or Rule 10b-5, the Court has no occasion to address Defendants alternative grounds for dismissal, based on alleged deficiencies in Plaintiff's pleadings as to scienter[.]"); *DoubleLine Capital*, 323 F. Supp. 3d at 455 ("[t]he Court need not address" arguments relating to scienter where plaintiffs have "not sufficiently pleaded that [defendant] made any false or misleading statements").

### D. Section 20(a) Claim for "Control Person Liability"

Because plaintiffs have not pleaded a primary securities fraud violation, their § 20(a) claim fails as a matter of law. *ATSI*, 493 F.3d at 108; *Papa John's*, 444 F. Supp. 3d at 558-59.

[14] Plaintiffs appear to argue an even more attenuated theory: that Teladoc was required to disclose the affair between Hirschhorn and Griffin because it ultimately led to whistleblower retaliation and "the disruption of Teladoc's operations," including disfunction in the credentialing department following the appointment of an incompetent manager to replace McKay. Pl. Mem. at 20. However, plaintiffs do not point to any promise by Teladoc that it would never make a poor hiring choice. Nor do they identify any other disclosures rendered misleading by the alleged failure to announce Hirschhorn's misconduct.

### E. Leave to Amend

In a single sentence at the end of their opposition brief, plaintiffs request that, "if any part of the [SAC] is dismissed," they be granted leave to amend. Pl. Mem. at 33.

"[T]he Second Circuit has consistently stated that district courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without any justification or accompanying suggested amended pleading." *In re Ferrellgas Partners, L.P., Securities Litigation*, 2018 WL 2081859, at *20 (S.D.N.Y. Mar. 30, 2018) (collecting cases), *aff'd*, 764 F. App'x 127 (2d Cir. 2019). Indeed, the only case cited by plaintiffs in support of their request for leave to amend, *Loreley Fin. No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160 (2d Cir. 2015), notes that district courts may deny such leave on notice grounds, "where the request gives no clue as to how the complaint's defects would be cured." *Id*. at 190. Plaintiffs here, who have already twice amended their pleading, offer no clue as to what might save their claims if they were granted another opportunity.[15] I therefore conclude that amendment would be futile.

## III. CONCLUSION

For the reasons set forth above, I respectfully recommend that defendants' motion to dismiss be GRANTED and that the Second Amended Consolidated Class Action Complaint be DISMISSED without leave to amend.

Dated: New York, New York
September 4, 2020

**BARBARA MOSES**
**United States Magistrate Judge**

---

[15] At oral argument, plaintiffs' counsel stated that if granted leave to amend "we would . . . continue our investigation and we would seek leave to amend to reflect that." Tr. at 36:2-4.

**NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Gregory H. Woods at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Woods. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).