# UNITED STATES DISTRICT COURT
# SOUTHEN DISTRICT OF NEW YORK

| | |
|---|---|
| JON REINER, Individually and on Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>   vs.<br><br><br>TELADOC HEALTH, INC., JASON GOREVIC, and MARK HIRSCHHORN,<br><br>                Defendants. | Case No.: 1:18-cv-11603 GHW<br><br>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiffs Wayne Arcuri, Badruddin Salimbhai, and David Williams (collectively "Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Teladoc Health, Inc. ("Teladoc" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, interviews of former Company employees, and other public statements issued by, or about, the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons and/or entities who purchased or otherwise acquired the Company's securities between March 3, 2016 and December 5, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Teladoc was founded in 2002 and is headquartered in Purchase, New York. Teladoc calls itself the global leader in virtual care.  Providing telehealth services worldwide, the Company offers a portfolio of services and solutions covering medical subspecialties.

3.     Defendant Mark Hirschhorn ("Hirschhorn") was Executive Vice President ("EVP"), Chief Operating Officer ("COO"), and Chief Financial Officer ("CFO") of Teladoc. Defendant Hirschhorn became the Company's EVP and CFO in October 2012 and took on the additional role of COO in September 2016.

4.     Since May 2014, Teladoc allowed violations of employment discrimination laws, sexual harassment laws, and its own corporate governance policies to take place at the Company. Specifically, Hirschhorn engaged in an affair with a low-level Company employee in Texas named

1

Charece Griffin ("Griffin").  Griffin regularly discussed her relationship with Hirschhorn with other employees at the Company, including telling them that Hirschhorn told her when he thought there were good opportunities for Griffin to sell Company shares.  Hirschhorn's track record, Griffin told colleagues, was "pretty good."  According to a former employee who worked with Griffin, Hirschhorn provided Griffin with a substantial amount of money to trade Teladoc stock.

5.     After learning about Griffin's inappropriate relationship with Hirschhorn, Amy McKay ("McKay"), Teladoc's Clinical Director, Vice President of the Payor Relations unit, and Griffin's ultimate boss, reported the inappropriate relationship.  Specifically, according to a former Company employee, in late 2015 or early 2016, McKay was on a telephone call with Pina Tripodi ("Tripodi"), Teladoc's Director of Human Resources ("HR").  After McKay told Tripodi that McKay knew that Hirschhorn and Griffin were having an affair, Tripodi said that she did not believe McKay.  When McKay responded by stating that the relationship between Hirschhorn and Griffin was causing drama in her department and that the situation was basically becoming unmanageable, Tripodi told McKay that maybe McKay needed to find a new job.

6.     Additionally, in October 2016, McKay drafted an eight-page document that set forth a timeline of the relationship between Hirschhorn and Griffin and detailed the widespread complaints of unfairness in connection with Griffin's stock trades that other employees raised. McKay submitted the memorandum to both the Legal and HR departments of Teladoc.

7.     Also in October 2016, several Teladoc employees who knew of Hirschhorn's affair with Griffin filed police reports addressing harassment (specifically, threatening and disturbing anonymous emails directed to their corporate email addresses) they received, which some suspected were from Griffin.  These employees were driven to the police after they reported the harassment to Teladoc's HR department yet were told to address the matter with the police

department.   Thus, Defendants' intent was to "sweep under the rug" damaging information regarding Hirschhorn or, at the very least, to be willfully blind to such information.

8.      The police reports further indicate that Teladoc's HR department knew about the allegations against Hirschhorn even before McKay's report.   One of these employees' police reports shows that the employee had taken her concerns to the Company's HR department before she received these threatening emails in October 2016.   Nevertheless, Defendant Gorevic falsely informed several analyst firms covering the Company, including Credit Suisse and Leerink, that Teladoc was not aware of Hirschhorn's affair at the time of his promotion to COO.   In other words, the Company concealed and refused to meaningfully investigate Hirschhorn's misconduct and violations of the Code of Business Conduct and Ethics (the "CBCE") prior to his promotion to COO, which demonstrates that Teladoc's executives acted intentionally and/or recklessly.

9.      McKay learned in November 2016 that the Company had retained an outside law firm to conduct an investigation of her allegations, and that her allegations were ultimately shown to be accurate.   Despite the fact that the outside investigation revealed inappropriate conduct by Hirschhorn, the Company and Gorevic failed to act to ensure that investors would not be harmed. On December 27, 2016, the Company entered into an amended employment contract with Hirschhorn with two minor slaps on the wrist: (1) a prohibition from violating the employee handbook; and (2) for a period of one year, a suspension of the scheduled share vesting awarded to him as part of his compensation.

10.     At all relevant times, the Company purported to be committed to "the highest standards of integrity and ethics in the way it conducts business," and, to that end, adopted a CBCE that applied to all of its employees, officers, and directors, including its Chief Executive Officer

3

("CEO"), CFO, and all other executive and senior officers.  In fact, the CBCE, which was publicly available, expressly forbade insider trading.

11.     Additionally, the CBCE provided, among other things, that *"[a]ll employees, officers and directors are expected to comply with all of the provisions of this Code"* and that the *"Code will be strictly enforced throughout the Company and violations will be dealt with immediately, including subjecting persons to corrective and/or disciplinary action such as dismissal or removal from office."*[1]  The CBCE further provided that *"[t]he Company encourages all employees, officers and directors to report any suspected violations promptly and intends to thoroughly investigate any good faith reports of violations"* and that *"[t]he Company will not tolerate any kind of retaliation for reports or complaints regarding misconduct that were made in good faith."*

12.     Despite these and other representations, Defendants made materially false and misleading statements throughout the Class Period regarding the Company's business, operational, and compliance policies.  Specifically, Defendants made false and misleading statements by failing to disclose that: (1) Defendant Hirschhorn was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; (4) the Company's enforcement, including the firing of whistleblowers, of its own purported employment and trading policies was inadequate to prevent the foregoing conduct; and (5) as a result, the Company's public statements were materially false and misleading at the time they were made.

---

[1]     Unless otherwise indicated, all emphasis is added.

13.     On December 5, 2018, the Southern Investigative Research Foundation ("SIRF") published a report (the "SIRF Report") revealing that CFO Hirschhorn had engaged "in an affair with . . . an employee many levels below him on the company's organizational chart." The SIRF Report stated that "during their relationship, [the employee] received a series of promotions over colleagues with either more industry experience or better credentials that stunned her former colleagues."   Consequently, the employee's annual compensation grew to about $125,000.   In addition, the SIRF Report stated that the employee and Hirschhorn "liked to trade Teladoc Health's stock together," with Hirschhorn "tell[ing] her when he thought there were good opportunities to sell some shares." According to the SIRF Report, "[a]fter spending months 'bitterly complaining and arguing with the HR and Legal departments over the [Mark Hirschhorn] decision,' according to two of her former colleagues who talked regularly with her during this period about these conversations, McKay was fired late one morning in October, 2017." Meanwhile, Griffin resigned quietly in late 2017.  As the SIRF Report noted, Hirschhorn, however, "stayed [in his position] with nearly nary a consequence. . . ."  As McKay's counsel later stated, Hirschhorn's conduct was at the very least "a violation of a bunch of [the Company's] own employee conduct clauses. . . . I am not sure why they tolerated the CFO doing that."  Following publication of the SIRF Report, Teladoc's stock price fell sharply by $4.00, or 6.69%, to close at $55.81 on December 6, 2018.

14.     On December 20, 2018, Teladoc filed a Form 8-K with the SEC announcing that "[o]n December 17, 2018, Mark Hirschhorn resigned as Executive Vice President, Chief Operating Officer and Chief Financial Officer of Teladoc Health, Inc. (the "Company"), effective January 1, 2019.  Mr. Hirschhorn's resignation was made with good reason under his executive employment agreement with the Company."

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.   Conversely, Teladoc's insiders collectively sold more than 1.4 million shares of Company stock during the Class Period for ***proceeds of more than $53 million*** while the Company's investors incurred substantial losses.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

18.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

19.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

20.     As set forth in the previously-filed certifications that are incorporated by reference herein, Plaintiffs purchased the Company's common stock during the Class Period and have been damaged thereby.

21.     Defendant Teladoc is a Delaware corporation with its principal executive offices located at 2 Manhattanville Road, Suite 203, Purchase, New York.  Teladoc's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "TDOC."

22.     Defendant Jason Gorevic ("Gorevic") has served at all relevant times as the CEO of Teladoc.

23.     Defendant Hirschhorn has served at all relevant times as the EVP, COO, and CFO of Teladoc.

24.     Defendants Gorevic and Hirschhorn are collectively referred to herein as the "Individual Defendants."

25.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company.  Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

27.     The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

28.     The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiffs and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

**Background**

30.     Teladoc was founded in 2002 and is headquartered in Purchase, New York. Providing telehealth services worldwide, the Company offers a portfolio of services and solutions covering 450 medical subspecialties.  Such subspecialties include the flu, upper respiratory infections, cancer, and congestive heart failure.  Teladoc provides its services through mobile devices, the Internet, video, and telephone.  The Company serves health plans, health systems, and other entities.  Formerly known as "Teladoc, Inc.," the Company changed its name to "Teladoc Health, Inc." in August 2018.

31.     Defendant Hirschhorn became the Company's EVP and CFO in October 2012, and took on the additional role of COO in September 2016.

32.     At all relevant times, the Company purported to be committed to "the highest standards of integrity and ethics in the way it conducts business."  To that end, it adopted a CBCE which applies to all of its employees, officers and directors, including its CEO, CFO, and all other executive and senior officers.

9

**Hirschhorn's Improper Relationship with Griffin**

33.     The SIRF Report was published on December 5, 2018 and is attached hereto as Exhibit A.  Plaintiffs hereby incorporate the SIRF Report by reference as though set forth in full herein.

34.     The SIRF Report – which has been supported and confirmed by subsequent investigation and reports – reveals that Teladoc allowed violations of employment discrimination laws, sexual harassment laws, and its own corporate governance policies to take place at the Company for years.  Specifically, the SIRF Report revealed that Hirschhorn engaged in an affair with a low-level employee of the Company, Griffin, and that the two engaged in potentially illegal insider trading together.  After Griffin received a stock grant, Hirschhorn told her when he thought there were good opportunities to sell some shares.  The SIRF Report was the product of a thorough investigation, including interviews with at least seven former colleagues of Griffin between 2014 and the end of 2017.

35.     Specifically, the SIRF Report provided the following:

**Teladoc Health: A CFO's 'Other Life' Worked Out Nicely (For the Ex-Girlfriend & Her Boss? Not So Much)**

By Roddy Boyd December 5, 2018

Work-life balance, an ever elusive goal for many American corporate executives, has been given a fresh new meaning at fast-growing Teladoc Health, a provider of on-demand medical videoconferencing.

But don't expect to hear about generous paternity leave or a slick new gym at headquarters; this is one benefit that Teladoc Health definitely isn't advertising.

In a nutshell, for a little over two years Teladoc Health's chief financial officer Mark Hirschhorn, 54, was having an affair with Charece Griffin, now 30 and an employee many levels below him on the company's organizational chart.

At the end of it, the powerful, high-profile executive stayed with nearly nary a consequence, while his girlfriend — and her boss — hit the road.

———————————

Let's start with this relationship's unique optics, which appear designed to give a corporate lawyer a heart attack: While Griffin was not initially a direct subordinate of Hirschhorn, when he was given the additional title of chief operating officer in September 2016, that distinction was all but erased. Moreover, during their relationship, Griffin received a series of promotions over colleagues with either more industry experience or better credentials that stunned her former colleagues. She did well enough, records indicate, that she was able to trade out of a 7-year-old Kia and buy a late model Mercedes in February 2017. (In fairness to Griffin, several of her former colleagues spoke highly of her motivation and personality. Griffin didn't reply to repeated attempts to seek comment through phone, text and email.)

From the perspective of power dynamics, it looks even worse.

Hirschhorn, a resident of tony Larchmont, New York, has been married since 1993, and along with his other duties, is responsible for managing the crucial relationships with investors, bankers and brokerage firm research analysts that have helped Teladoc Health raise nearly $1.3 billion in capital since March 2015. In turn, that money has enabled almost $625 million worth of recent acquisitions, which is driving the rapid revenue growth so beloved by money managers.

Accordingly, Hirschhorn has been well paid. (Hirschhorn did not reply to several voice messages left at his residence, nor to a pair of emails.)

Griffin, in a blunt contrast, is a single mother of two children who did not attend college and joined the company in May 2014 when Teladoc Health purchased Ameridoc. Working out of the Lewisville, Texas, office, she was in the unit that identified and enrolled doctors and nurses for its provider network. Former colleagues pegged her income as topping out at about $125,000.

With a tangled backstory like that, common sense suggests that the relationship be kept as low key as possible.

That's not how it happened though: Griffin, according to her former colleagues, openly discussed her relationship with Hirschhorn. And if those co-workers initially harbored doubts about whether their CFO was really rendezvousing with Griffin, they were put to rest when Hirschhorn sent flowers to her desk after some of his Lewisville visits.

(Lewisville, about 25 miles north of Dallas, is where Teladoc Health's non-executive operations are located, and thus given Hirschhorn's dual COO and CFO role, he visited frequently.)

It appeared to have been a standard office romance — as familiar to many in real life as it is on TV — with them emailing each other, talking on the phone, going to dinner when Hirschhorn was in town; he even took her to Las Vegas for a few days. Except this was between perhaps the most important man in the company and a woman who, at least at the beginning of their relationship, was barely a mid-level employee.

There was one other aspect to their relationship that struck Griffin's ex-colleagues as unusual, with very good cause: Griffin told them she and Hirschhorn liked to trade Teladoc Health's stock together. More accurately, after Griffin received a stock grant, Hirschhorn would tell her when he thought there were good opportunities to sell some shares. His track record, she proudly told colleagues, was pretty good.

Unsurprisingly, this struck many of Griffin's then-colleagues as massively unfair. As such, one after another they marched into the office of Amy McKay (she was Teladoc Health's ninth employee) and the executive who was the clinical director and vice president of the payor relations unit — as well as Griffin's ultimate boss — and loudly complained.

Long aware of the relationship, and shocked at the risk Hirschhorn had incurred as a married man with kids in college, McKay told these colleagues that trading your employer's stock based on tips from your boyfriend — and the company's CFO — was the last straw in a situation that in her assessment had become toxic. So in October 2016, McKay drafted an eight-page document that was a timeline of the relationship — and an enumeration of the things that she and her subordinates felt were most problematic about it — and submitted it to both the legal and human resources departments.

McKay, per three of her former subordinates, was pleasantly surprised when Teladoc Health's legal department told her they had hired an outside law firm to conduct an independent review of her claims. After its conclusion roughly a month later, word got down to McKay that the law firm had substantiated her assertions, and that swift action would be taken to address it.

It's not hard to imagine McKay's shock when the promised action arrived on Dec. 27, 2016, in the form of an amended employment contract for Hirschhorn, bearing two new features that he was required to abide: A prohibition from violating the employee handbook, and for a period of one year, a suspension of the scheduled share vesting awarded to him as compensation.

That's all.

Aside from a slight change in the lightly read legal boilerplate, Hirschhorn remained unscathed, with no other public or private sanction.

Regardless of what 2017 meant for Hirschhorn's heart, his wallet had one hell of a year, with his total compensation nearly doubling to $3.27 million from $1.21 million.

That wasn't (literally) the half of what he made though.

Through a Rule 10b5-1 plan set up in September 2016, Hirschhorn sold or exercised Teladoc Health options equivalent to 275,000 shares for almost $7.94 million, before commissions and taxes. According to the Securities and Exchange Commission Form 4 filings that list the securities transactions of corporate insiders, he's been just as active this year: Through Nov. 2, he unloaded another 265,000 shares, or nearly 99 percent of what he held in January, for just under $13.02 million in proceeds.

(To be sure, there's nothing inappropriate about an executive selling his stock, especially on a scheduled plan where they have ceded control over the timing of the trades to a broker. Nor is he alone among Teladoc Health's senior managers in selling a lot of stock — chief legal officer Adam Vandervoort also sold most of his common stock this year, which when combined with stock options he exercised, grossed over $8.42 million, and chief executive officer Jason Gorevic, whose sales brought him more than $14.89 million.)

Amy McKay, on the other hand, would come to view 2017 very differently.

After spending months "bitterly complaining and arguing with the HR and Legal departments over the [Mark Hirschhorn] decision," according to two of her former colleagues who talked regularly with her during this period about these conversations, McKay was fired late one morning in October 2017. She said to her former colleagues that all she was told was, "It was a business decision." The termination came nearly a year from the day she filed her eight-page document, and adding insult to injury, corporate security escorted her immediately from the office. (Within the following two weeks, nearly 20 percent of her unit would resign; three ex-colleagues of McKay put the total as high as 30 percent.)

Amy McKay's departure cost her the opportunity to have made a good deal of money through stock and option grants, especially given the sharp appreciation in the price of Teladoc Health's stock over the past year. She would eventually sign a nondisclosure agreement as part of her severance package and she didn't return numerous phone calls seeking comment. McKay still works in the Dallas area, albeit in a different industry.

Charece Griffin, in contrast, resigned quietly in late 2017 and now sells real estate in the Dallas area.

Andrew Dunlap, an Irving, Texas-based attorney who represented Griffin during the negotiation over her exit from Teladoc Health, said the terms of her severance

agreement prohibit him from discussing it in any detail. He did, however, confirm his client's relationship with Hirschhorn.

Speaking broadly about the circumstances of his representation, Dunlap said, "A settlement was the best combination of fairness and closure open to her." He said filing a suit and going to trial could have meant a great deal of expense and stress for Griffin, and with the Dallas-Fort Worth area's tradition of cultural conservatism and a history of racial division, he felt there was a "lot of risk" in asking a jury to side with a black woman who had been in an extramarital relationship with a rich white man.

Dunlap said he is still astonished at the accountability differential between how his client was viewed and treated, and what Hirschhorn experienced.

"After the agreement was signed and I was on my way out of the room, [Teladoc Health's] outside counsel at Proskauer Rose told me that Hirschhorn was definitely going to 'feel punished,'" he said. He added, "I took that to mean the company was angry about his conduct and judgement. I didn't think she meant there would be nothing." (Dunlap declined to name the Proskauer lawyer he was referring to.)

The aspect of the Griffin and Hirschhorn matter that Dunlap is able to talk more freely about, primarily because he says it wasn't covered in the settlement agreement, is the trading in Teladoc Health's stock.

"My own work led me to conclude that at the very least, this was a violation of a bunch of [Teladoc Health's] own employee conduct clauses," he said. "I'm not sure why they tolerated the CFO doing that."

The Southern Investigative Reporting Foundation sought out Dr. William Frist, a former U.S. senator from Tennessee and a key Teladoc Health director since September 2014, to see what (if anything) he and fellow board members knew about Hirschhorn's conduct. As of the time of publication, Erin Rogus, a policy advisor and spokeswoman for Dr. Frist, had not returned an email seeking comment.

––––––––––––––––––

Over the course of reporting this article, as noted above, the Southern Investigative Reporting Foundation made repeated attempts to contact Hirschhorn, Griffin and McKay using phone, text and email. None of them commented for this story.

To make Teladoc Health aware of the foundation's reporting and to give company leadership a chance to comment, chief legal officer Adam Vandervoort and Chief Executive Officer Jason Gorevic were included in the emails sent to Hirschhorn. See them in two batches. The company did not reply.

Vandervoort did not return two additional phone calls seeking comment; Gorevic, reached on his cell, angrily declined to comment.

With respect to sourcing, seven former payor relations unit employees — all of whom worked closely with both Amy McKay and Charece Griffin from 2014 to the end of 2017 — provided information to the Southern Investigative Reporting Foundation through numerous interviews, as well as their notes of relevant meetings.

Because of their concern over litigation or professional repercussions, these former executives were not named in the article.

**Former Company Employees Confirm Hirschhorn's Improper Conduct**

36.    Former Employee 1 ("FE1") was a Physician Recruiter from August 2015 through January 2018 at the Lewisville, Texas, office of Teladoc, the same office where Griffin and McKay worked.  During this time, FE1 worked in McKay's department.  When FE1 started at Teladoc in 2015, personnel at the office were openly discussing Griffin's improper relationship with Hirschhorn.

37.    Former Employee 2 ("FE2") was a Provider Relations Manager and Corporate Recruiter at Teladoc's Lewisville office from March 2015 through January 2018.  According to FE2, Griffin regularly discussed her relationship with Hirschhorn with other employees at the Company.  FE2 stated that in August or September 2015, Griffin told FE2 that she was having an affair with Hirschhorn.  FE2 recalled that the improper relationship lasted two to two-and-a-half years.

38.    Former Employee 3 ("FE3") was a Credentialing Coordinator at Teladoc's Lewisville office from January 2016 until 2019.  FE3 also personally observed Griffin openly discussing her relationship with Hirschhorn with colleagues.

39.    FE1 personally became aware of the affair between Hirschhorn and Griffin in August or September 2015 when FE1 saw Hirschhorn and Griffin cuddled together in a booth at a

15

restaurant.  FE1 reported the sighting to McKay.  FE1 also stated that Griffin was always getting flowers at the office and that most people suspected the flowers were from Hirschhorn.

40.     FE1 also stated that McKay went to HR because of the improper relationship between Hirschhorn and Griffin.  Specifically, FE1 stated that FE1 was in McKay's office in late 2015 or early 2016 (FE1 believes it was in January or February 2016) when McKay was on a telephone call with Tripodi, Teladoc's HR Director.  FE1 stated that McKay told Tripodi that McKay knew that Hirschhorn and Griffin were having an affair.  Tripodi then told McKay that she did not believe McKay.  According to FE1, McKay responded by stating that the relationship between Hirschhorn and Griffin was causing drama in her department and that the situation was basically becoming unmanageable.  In response, Tripodi told McKay that McKay maybe needed to find a new job.

41.     FE1 also heard Griffin brag that Hirschhorn at one point gave her $10,000 in cash to buy stocks and told her when to buy and when to sell.  FE2 also heard Griffin loudly boast that Defendant Hirschhorn was giving her stock and telling her when to sell.

42.     Based on discussions with McKay, FE1 stated that McKay, who was Griffin's boss, reported the improper relationship to both Tripodi and Theresa Kirk-Fowler ("Kirk-Fowler"), Teladoc's Associate Director of HR.  FE2 also reported the improper relationship, including allegations of insider trading, to Tripodi and Kirk-Fowler.  FE2 stated that other personnel reported the matter to HR.

43.     McKay also drafted an eight-page document that set forth a timeline of Hirschhorn and Griffin's relationship and detailed the complaints of unfairness in connection with Griffin's stock trades that other employees raised.  McKay then submitted the memorandum to both the Legal and HR departments of Teladoc.

44.   McKay's report was evidently conveyed to Teladoc's senior management, because, as FE3 observed, Teladoc's Chief Legal Officer, Adam Vandervoort ("Vandervoort"), went to the Lewisville office to interview McKay.

45.   FE1 stated further that McKay was "treated pretty bad[ly]" after she told Tripodi that she knew about the relationship between Hirschhorn and Griffin.  According to FE1, soon after McKay reported the improper relationship to HR, McKay and at least a few other Teladoc personnel began to receive harassing emails to their Teladoc corporate address from obviously pseudonymous email addresses.  These emails contained spurious accusations (*e.g.*, talking to competitors, falsifying documents) and indications that personnel were being followed.  FE1 forwarded the harassing emails to Kirk-Fowler, who stated that she would forward them to Teladoc's headquarters.  In addition, Kirk-Fowler advised FE1 to file a police report if FE1 was so worried about the situation.  FE1 did file a police report in Lewisville.  According to FE1, McKay herself also filed a police report.  The police reports are attached hereto as Exhibits B and C, which Plaintiffs hereby incorporate by reference as though set forth in full herein.[2]

46.   The police report attached as Exhibit B is dated October 25, 2016, but describes an incident on October 9, 2016.  The report contains the following statement by the complainant: "I was threatened at work through a fake email address. Several other employees received emails. This was very upsetting to me and I feel harassed, and stalked and bullied. I went to HR and they suggested that if I feel this way to report it to Lewisville PD.  We have an employee that formerly

---

[2]   Plaintiffs obtained copies of these police reports, with names redacted, from a report titled "Police Reports Cast Doubt On Teladoc's Response To SIRF Story," posted at *Seeking Alpha* on December 17, 2018 (https://seekingalpha.com/instablog/38059736-the-friendly-bear/5248178-police-reports-cast-doubt-teladoc-s-response-sirf-story).

worked in my department and it is very possible that she is doing this. I have attached her [email]. I do not take threatening of my job lightly." The report includes an example email.

47.     The police report attached as Exhibit B also indicates that the investigating officer noted that the complainant "feels that her company knows who the sender is, but that sender is 'sleeping with' one of the supervisors, so the company is just going to 'sweep this under the rug.'"

48.     The police report attached as Exhibit C is dated October 30, 2016, but describes an incident on October 2, 2016. The report contains the following statement by the complainant: "I have been receiving harassing emails to my office regarding my personal appearance, car [etc.]. . . . There have been 7 emails in less than a month." The report includes example emails.

49.     McKay learned in November 2016 that the Company had retained an outside law firm to conduct an investigation of her allegations, which were ultimately shown to be accurate. As McKay's counsel later stated, Hirschhorn's conduct was at the very least "a violation of a bunch of [the Company's] own employee conduct clauses. . . . I am not sure why they tolerated the CFO doing that."

50.     Despite the fact that the outside investigation revealed inappropriate conduct by Hirschhorn, Teladoc and Gorevic failed to act to ensure that investors would not be harmed. On December 27, 2016, the Company entered into an amended employment contract with Hirschhorn, with two minor slaps on the wrist: (1) a prohibition from violating the employee handbook; and (2) for a period of one year, a suspension of the scheduled share vesting awarded to him as part of his compensation.

51.     Approximately 10 months later, according to the SIRF Report, "[a]fter spending months 'bitterly complaining and arguing with the HR and Legal departments over the [Mark Hirschhorn] decision,' according to two of her former colleagues who talked regularly with her

during this period about these conversations, McKay was fired late one morning in October, 2017."

Meanwhile, Griffin resigned quietly in late 2017. As the SIRF Report noted, Hirschhorn, however,

"stayed [in his position] with nearly nary a consequence. . . ."

52.     After reporting Hirschhorn's improper relationship, FE2 also experienced severe

retaliation. FE2 stated that Gary Britton ("Britton") (Vice President of Operations) and Britton's

team of directors and managers all bullied FE2 constantly after FE2 reported Hirschhorn's

improper relationship to HR. FE2 described weekly meetings in which FE2 participated during

which Britton "raked me through the coals every week" and that the harassment was "very cruel."

FE2 reported the retaliation to Tripodi, Teladoc's HR Director. Although Tripodi claimed that she

would investigate FE2's complaints, FE2 stated that the retaliation continued. FE2 believes that

Tripodi told Britton that FE2 had reported Hirschhorn's improper relationship to HR. FE2 stated

further that Britton reported to Hirschhorn and that Britton wanted to protect Hirschhorn. FE2

said that when the Company placed John Golisano ("Golisano") in the role as an Interim Manager

(to whom FE2 reported at the time), Golisano told FE2 that FE2 should look for another job.

According to FE2, Golisano said that he had spoken with Britton and that Britton wanted FE2 out.

**How Hirschhorn's Conduct Endangered Teladoc's Accreditation Status**

53.     Hirschhorn's improper relationship with Griffin also caused major disruptions in

Teladoc's credentialing unit, where Griffin worked, which, in turn, led to material consequences

for the Company.

54.     According to FE1, McKay's department, among other things, handled physician

recruiting and credentialing. When McKay managed the department, personnel there conducted a

pre-approval process before sending each physician on to the official credentialing process. This

process helped ensure that Teladoc would achieve clean audits by the National Committee for

Quality Assurance ("NCQA"), an outside entity that provides accreditation to healthcare companies.

55.     Defendants considered NCQA accreditation to be a significant selling point to payors and investors, as demonstrated by the fact that Teladoc's Form 10-Ks filed before 2019 touted the Company's accreditation.  Indeed, the Company represented that it was the first telehealth company to achieve NCQA certification.

56.     After the internal investigation of the Hirschhorn-Griffin relationship, FE1 stated that Teladoc replaced McKay with Suzanne Leary ("Leary"), who lacked any qualifications to manage McKay's department.  Leary had zero experience with credentialing doctors, nor did the manager she brought in to work under her.  FE3 agreed that Leary's team did not know how to credential doctors.

57.     Leary's team resorted to falsifying documents.  For example, FE3 received an email in which a member of Leary's team, who was based in Boston, communicated his intention to falsify someone's initials for purposes of passing the NCQA audit.  In response, FE3 forwarded the email to Teladoc's inside and outside counsel.  After reporting this incident, FE3 was stripped of most of job responsibilities, and FE3 quit soon thereafter.

58.     Based on FE3's communications with NCQA investigators, NCQA became aware that certain Teladoc personnel had falsified doctor credential documents.  In response, NCQA investigators immediately arrived at the Company and began a lengthy audit.

59.     FE3 explained that without NCQA accreditation, Teladoc is at risk of losing contracts with health insurance companies, and, in turn, losing doctors.

60.     On May 15, 2019, NCQA placed Teladoc on "Under Corrective Action" status, which is defined as "[a] temporary accreditation status notation pending an NCQA review."

**Defendants' False Defense of Its Handling of Hirschhorn's Improper Relationship**

61.     After the SIRF Report was published on December 5, 2018, Defendant Gorevic made false and misleading statements to analyst firms covering Teladoc, including Credit Suisse and Leerink. Among other things, Gorevic misrepresented that: (1) Teladoc was not aware of Hirschhorn's improper relationship with a subordinate at the time of his promotion to COO; and (2) McKay was not terminated for reporting the relationship and left voluntarily because she did not want to relocate to Boston following a restructuring.

62.     As indicated above, according to FE1, in late 2015 or early 2016, McKay was on a telephone call with Tripodi, Teladoc's HR Director.  After McKay told Tripodi that McKay knew that Hirschhorn and Griffin were having an affair, Tripodi said that she did not believe McKay. When McKay responded by stating that the relationship between Hirschhorn and Griffin was causing drama in her department and that the situation was basically becoming unmanageable, Tripodi told McKay that maybe McKay needed to find a new job.

63.     Additionally, police reports indicate that the email harassment against McKay and other Teladoc personnel began no later than October 2, 2016.  This harassment occurred in response to McKay's having reported the improper Hirschhorn-Griffin relationship to senior management. Therefore, it is highly unlikely that senior management was ignorant of the relationship at the time that Hirschhorn was promoted to COO on September 28, 2016.  In other words, the Company concealed and/or refused to meaningfully investigate Hirschhorn's misconduct and violations of the CBCE prior to his promotion to COO, which demonstrates that Teladoc's executives acted intentionally and/or recklessly.

64.     Moreover, the police report filed by McKay, along with her ouster as detailed above, belie Gorevic's representation that McKay left voluntarily.

**Materially False and Misleading Statements Issued During the Class Period**

65.     The Class Period begins on March 3, 2016, when the Company filed its Form 10-

K for the fiscal year ended December 31, 2015 (the "2015 10-K").  In the 2015 10-K, the Company

falsely touted the reliability and personal ethics of its key executives, stating:

> ***We depend on our senior management team, and the loss of one or more of our
> executive officers or key employees or an inability to attract and retain highly
> skilled employees could adversely affect our business***.
>
> Our success depends largely upon the continued services of our key executive
> officers.  These executive officers are at-will employees and therefore they may
> terminate employment with us at any time with no advance notice.  We maintain
> "key person" insurance in the amount of $4.0 million for Jason Gorevic, our Chief
> Executive Officer, but not for any of our other executive officers or any of our other
> key employees.  We also rely on our leadership team in the areas of research and
> development, marketing, services and general and administrative functions.  From
> time to time, there may be changes in our executive management team resulting
> from the hiring or departure of executives, which could disrupt our business.  The
> replacement of one or more of our executive officers or other key employees would
> likely involve significant time and costs and may significantly delay or prevent the
> achievement of our business objectives.
>
> To continue to execute our growth strategy, we also must attract and retain highly
> skilled personnel.  Competition is intense for qualified professionals.  We may not
> be successful in continuing to attract and retain qualified personnel. . . . Failure to
> attract new personnel or failure to retain and motivate our current personnel, could
> have a material adverse effect on our business, financial condition and results of
> operations.

66.     In addition, Defendants acknowledged the importance of executives' personal

probity in the 2015 10-K that any "employment claims made by [the Company's] current or former

associates . . . may result in substantial costs and may divert management's attention and resources,

which may substantially harm [its] business, financial condition and results of operations."

Moreover, "[i]nsurance may not cover such claims, may not provide sufficient payments to cover

all of the costs to resolve one or more such claims and may not continue to be available on terms

acceptable to us.  A claim brought against us that is uninsured or underinsured could result in

unanticipated costs, thereby reducing our revenue and leading analysts or potential investors to reduce their expectations of our performance, which could reduce the market price of our stock."

67.     These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies was inadequate to prevent the foregoing conduct.  In other words, Defendants promoted the competence and experience of its executives, while they were actually or constructively aware of the pervasive violations of the Company's policies.  The Company further failed to disclose that one of its executives had been violating such policies and was at risk of losing his job (which would adversely affect the Company's operations) for his misconduct.

68.     On April 15, 2016, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2016 Proxy"), which stated that "Teladoc is committed to the ***highest standards of integrity and ethics in the way it conducts business***."

69.     In purported fulfilment of this goal, the 2016 Proxy further stated that "[d]uring 2015, the board adopted a Code of Business Conduct and Ethics, which applies to all of our employees, officers and directors, including our chief executive officer, chief financial officer, and all other executive and senior officers."  The 2016 Proxy described the CBCE as "establish[ing] our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with

laws and possible conflicts of interest." The 2016 Proxy further stated that "[u]nder our Code of

Business Conduct and Ethics, each of our directors and employees is required to report suspected

or actual violations. In addition, we have adopted separate procedures concerning the receipt and

investigation of complaints relating to accounting or audit matters."

70.     The 2016 Proxy further touted the CBCE, stating that a copy of it was available on

the Company's website. A copy of the CBCE is attached hereto as Exhibit D. Plaintiffs hereby

incorporate the CBCE by reference as though set forth in full herein.

71.     The CBCE provided the following:

**Teladoc, Inc.**

**Code of Business Conduct and Ethics**

Approved February 22, 2018

**1.      Introduction**

This Code of Business Conduct and Ethics ("Code") has been adopted by the Board
of Directors (the "Board") of Teladoc, Inc. (together with its subsidiaries, the
"Company") and summarizes the standards that must guide our actions. While
covering a wide range of business practices and procedures, these standards cannot
and do not cover every issue that may arise, or every situation where ethical
decisions must be made, but rather set forth key guiding principles that represent
Company policies and establish conditions for employment at the Company.

*We must strive to foster a culture of honesty and accountability. Our commitment
to the highest level of ethical conduct should be reflected in all of the Company's
business activities including, but not limited to, relationships with employees,
customers, suppliers, competitors, the government and the public, including our
shareholders. All of our employees, officers and directors must conduct
themselves according to the language and spirit of this Code and seek to avoid
even the appearance of improper behavior. Even well-intentioned actions that
violate the law or this Code may result in negative consequences for the Company
and for the individuals involved.*

*One of our Company's most valuable assets is our reputation for integrity,
professionalism and fairness. We should all recognize that our actions are the
foundation of our reputation and adhering to this Code and applicable law is
imperative.*

## 2.      Compliance with Laws, Rules and Regulations

***We are strongly committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations. No employee, officer or director of the Company shall commit an illegal or unethical act, or instruct others to do so, for any reason.***

If you believe that any practice raises questions as to compliance with this Code or applicable law, rule or regulation or if you otherwise have questions regarding any law, rule or regulation, please contact the Legal Department.  The Company also holds information and training sessions to promote compliance with the laws, rules and regulations that affect our business.

## 3.      Trading on Inside Information

***Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip", is illegal.  All such non-public information should be considered inside information and should never be used for personal gain.***  You are required to familiarize yourself and comply with the Company's policy against insider trading, copies of which are distributed to all employees, officers and directors and are available from the Legal Group.  You should contact the Legal Department with any questions about your ability to buy or sell securities.

## 4.      Protection of Confidential Proprietary Information

Confidential proprietary information generated and gathered in our business is a valuable Company asset.  Protecting this information plays a vital role in our continued growth and ability to compete, and all proprietary information should be maintained in strict confidence, except when disclosure is authorized by the Company or required by law.

Proprietary information includes all non-public information that might be useful to competitors, investors or that could be harmful to the Company, its customers or its suppliers if disclosed.  Intellectual property, such as trade secrets, patents, trademarks and copyrights, as well as business, research and new project plans, objectives and strategies, records, databases, salary and benefits data, employee medical information, customer, employee and suppliers lists and any unpublished financial or pricing information must also be protected.

Unauthorized use or distribution of proprietary information violates Company policy and could be illegal.  Such use or distribution could result in negative consequences for both the Company and the individuals involved, including potential legal and disciplinary actions.  We respect the property rights of other

companies and their proprietary information and require our employees, officers and directors to observe such rights.

Your obligation to protect the Company's proprietary and confidential information continues even after you leave the Company, and you must return all proprietary information in your possession upon leaving the Company.

## 5.    Conflicts of Interest

***Our employees, officers and directors have an obligation to act in the best interest of the Company.  All employees, officers and directors should avoid situations that present a potential or actual conflict between their interest and the interest of the Company.***

***A "conflict of interest" occurs when a person's private interest interferes in any way, or even appears to interfere, with the interest of the Company, including its subsidiaries and affiliates.  A conflict of interest can arise when an employee, officer or director takes an action or has an interest that may make it difficult for him or her to perform his or her work objectively and effectively.  Conflicts of interest may also arise when an employee, officer or director (or his or her family members) receives improper personal benefits as a result of the employee's, officer's or director's position in the Company.***

Although it is not possible to describe every situation in which a conflict of interest may arise, the following are examples of situations which may constitute a conflict of interest:

> – Working, in any capacity, for a competitor, customer or supplier while employed by the Company.
> – Accepting gifts of more than modest value or receiving personal discounts or other benefits as a result of your position in the Company from a competitor, customer or supplier.
> – Competing with the Company for the purchase or sale of property, services or other interests.
> – Having an interest in a transaction involving the Company, a customer or supplier other than as an employee, officer or director of the Company (not including routine investments in publicly traded companies).
> – Receiving a loan or guarantee of an obligation as a result of your position with the Company.
> – Directing business to a supplier owned or managed by, or which employs, a relative or friend.

Situations involving a conflict of interest may not always be obvious or easy to resolve. You should report actions that may involve a conflict of interest to the Legal Department.

In order to avoid conflicts of interests employees and officers must disclose to the Chief Legal Officer any material transaction or relationship that reasonably could be expected to give rise to such a conflict, and the Chief Legal Officer shall notify the Nominating and Corporate Governance Committee of any such disclosure. Conflicts of interests involving the Chief Legal Officer and directors shall be disclosed to the Nominating and Corporate Governance Committee.

**6.     Protection and Proper Use of Company Assets.**

Protecting Company assets against loss, theft or other misuse is the responsibility of every employee, officer and director.  Loss, theft and misuse of Company assets directly impact our profitability.  Any suspected loss, misuse or theft should be reported to a manager/supervisor or the Legal Department.

The sole purpose of the Company's equipment, vehicles and supplies is the conduct of our business.  They may only be used for Company business consistent with Company guidelines.

**7.     Corporate Opportunities**

Employees, officers and directors are prohibited from taking for themselves business opportunities that arise through the use of corporate property, information or position.   No employee, officer or director may use corporate property, information or position for personal gain, and no employee, officer or director may compete with the Company.  Competing with the Company may involve engaging in the same line of business as the Company, or any situation where the employee, officer or director takes away from the Company opportunities for sales or purchases of products, services or interests.

**8.     Fair Dealing**

Each employee, officer and director of the Company should endeavor to deal fairly with customers, suppliers, competitors, the public and one another at all times and in accordance with ethical business practices.  No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.  No bribes, kickbacks or other similar payments in any form shall be made directly or indirectly to or for anyone for the purpose of obtaining or retaining business or obtaining any other favorable action.   The Company and the employee, officer or director involved may be subject to disciplinary action as well as potential civil or criminal liability for violation of this policy.

Occasional business gifts to and entertainment of non-government employees in connection with business discussions or the development of business relationships are generally deemed appropriate in the conduct of Company business.  However, these gifts should be given infrequently and their value should be modest.  Gifts or

entertainment in any form that would likely result in a feeling or expectation of personal obligation should not be extended or accepted.

Practices that are acceptable in commercial business environments may be against the law or the policies governing federal, state or local government employees. Therefore, no gifts or business entertainment of any kind may be given to any government employee without the prior approval of the Legal Department.

Except in certain limited circumstances, the Foreign Corrupt Practices Act ("FCPA") prohibits giving anything of value directly or indirectly to any "foreign official" for the purpose of obtaining or retaining business. When in doubt as to whether a contemplated payment or gift may violate the FCPA, contact the Legal Department before taking any action.

## 9.    Quality of Public Disclosures

The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure and the Company has established a Disclosure Committee to assist in monitoring such disclosures.

## 10.   Compliance with This Code and Reporting of Any Illegal or Unethical Behavior

***All employees, officers and directors are expected to comply with all of the provisions of this Code. The Code will be strictly enforced throughout the Company and violations will be dealt with immediately, including subjecting persons to corrective and/or disciplinary action such as dismissal or removal from office. Violations of the Code that involve illegal behavior will be reported to the appropriate authorities.***

Situations which may involve a violation of ethics, laws or this Code may not always be clear and may require difficult judgment. Employees should report any concerns or questions about violations of laws, rules, regulations or this Code to their managers/supervisors or the Legal Department or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee of the Board of Directors. Interested parties may also communicate directly with the Company's non-management directors through contact information located in the Company's annual proxy statement.

***Any concerns about violations of laws, rules, regulations or this Code by the CEO, any senior financial officer, any senior officer or director should be reported promptly to the Chief Legal Officer, and the Chief Legal Officer shall notify the Nominating and Corporate Governance Committee of such violation.***

Any such concerns involving the Chief Legal Officer should be reported to the Nominating and Corporate Governance Committee.  Reporting of such violations may also be done anonymously through the Teladoc Ethics Hotline at 1-844-681-1241 or on the Web at teladoc.ethicspoint.com.  An anonymous report should provide enough information about the incident or situation to allow the Company to investigate properly.  If concerns or complaints require confidentiality, including keeping an identity anonymous, we will endeavor to protect this confidentiality, subject to applicable law, regulation or legal proceedings.

*The Company encourages all employees, officers and directors to report any suspected violations promptly and intends to thoroughly investigate any good faith reports of violations.  The Company will not tolerate any kind of retaliation for reports or complaints regarding misconduct that were made in good faith.*  Open communication of issues and concerns by all employees without fear of retribution or retaliation is vital to the successful implementation of this Code.  You are required to cooperate in internal investigations of misconduct and unethical behavior.

*The Company recognizes the need for this Code to be applied equally to everyone it covers.*  The Chief Legal Officer of the Company will have primary authority and responsibility for the enforcement of this Code, subject to the supervision of the Nominating and Corporate Governance Committee, or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee, and the Company will devote the necessary resources to enable the Chief Legal Officer to establish such procedures as may be reasonably necessary to create a culture of accountability and facilitate compliance with the Code.  Questions concerning this Code should be directed to the Legal Department.

## 11.     Waivers and Amendments

Any waivers of the provisions in this Code for executive officers or directors may only be granted by the Board of Directors and will be promptly disclosed to the Company's shareholders.  Any waivers of this Code for other employees may only be granted by the Legal Department.

Amendments to this Code must be approved by the Nominating and Corporate Governance Committee and amendments of the provisions in this Code applicable to the CEO and the senior financial officers will also be promptly disclosed to the Company's shareholders.

## 12.     Equal Opportunity, Non-Discrimination and Fair Employment

*The Company's policies for recruitment, advancement and retention of employees forbid discrimination on the basis of any criteria prohibited by law, including but not limited to race, sex and age.*  Our policies are designed to ensure that employees are treated, and treat each other, fairly and with respect and dignity.

29

In keeping with this objective, conduct involving discrimination or harassment of others will not be tolerated.  All employees are required to comply with the Company's policy on equal opportunity, non-discrimination and fair employment, copies of which were distributed and are available from the Legal Department.

**13.      Compliance with Antitrust Laws**

The antitrust laws prohibit agreements among competitors on such matters as prices, terms of sale to customers and allocating markets or customers.  Antitrust laws can be very complex, and violations may subject the Company and its employees to criminal sanctions, including fines, jail time and civil liability. If you have any questions, consult the Legal Department.

**14.      Political Contributions and Activities**

Any political contributions made by or on behalf of the Company and any solicitations for political contributions of any kind must be lawful and in compliance with Company policies.  This policy applies solely to the use of Company assets and is not intended to discourage or prevent individual employees, officers or directors from making political contributions or engaging in political activities on their own behalf.  No one may be reimbursed directly or indirectly by the Company for personal political contributions.

**15.      Environment, Health and Safety**

The Company is committed to conducting its business in compliance with all applicable environmental and workplace health and safety laws and regulations. The Company strives to provide a safe and healthy work environment for our employees and to avoid adverse impact and injury to the environment and communities in which we conduct our business.  Achieving this goal is the responsibility of all officers, directors and employees.[3]

72.     These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was

---

[3]     The statements contained in the CBCE cited in this Class Action Complaint appear in the Company's CBCE dated February 22, 2018.  Based on information and belief, the operative CBCE contained substantively similar statements throughout the Class Period.

unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies was inadequate to prevent the foregoing conduct.  In other words, Griffin was promoted in stark contradiction of Company policy, despite the Company falsely touting its purported fairness.  Hirschhorn's conduct also violated Company policy, and Defendants failed to disclose these violations.

73.     On March 1, 2017, the Company filed its Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K contained substantively identical statements to those detailed above in ¶¶65-66.  In an earnings call that day, Defendant Gorevic touted Teladoc's "continuing to enhance [its] overall corporate governance program."

74.     This statement was false and misleading.  Gorevic touted the Company's corporate governance program even as he knowingly and/or recklessly failed to disclose that: (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies was inadequate to prevent the foregoing conduct.  Despite being aware of Hirschhorn's misconduct, Gorevic failed to disclose it.

75.     On April 6, 2017, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2017 Proxy"), which stated that the Company is committed "to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics."

76.     In purported fulfilment of this goal, the 2017 Proxy further stated that "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all directors, officers and employees.  The purpose of this code is to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics.  Our Code of Business Conduct and Ethics establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest."

77.     The 2017 Proxy further touted the CBCE, stating that a copy of it was available on the Company's website.  Upon information and belief, the CBCE contained the representations set forth in ¶71.

78.     These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies was inadequate to prevent the foregoing conduct.  Defendants failed to disclose clear violations of the CBCE and failed to disclose that Hirschhorn's misbehavior put him at risk of losing his job.

79.     On February 27, 2018, the Company filed its Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K").  The 2017 10-K contained substantively identical statements to those detailed above in ¶¶65-66.

80.     These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies was inadequate to prevent the foregoing conduct.   Defendants failed to disclose clear violations of the CBCE and failed to disclose that Hirschhorn's misbehavior put him at risk of losing his job.

81.     On April 20, 2018, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2018 Proxy"), which stated that the Company is committed "to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics."

82.     In purported fulfilment of this goal, the 2018 Proxy further stated that "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all directors, officers and employees.   The purpose of this code is to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics.   Our Code of Business Conduct and Ethics establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest."

83.     The 2018 Proxy further touted the CBCE, stating that a copy of it was available on the Company's website.   The CBCE contained the representations set forth in ¶71.

84.     Additionally, the 2018 Proxy stated that the Company maintained an "Insider Trading Compliance Policy that applies to all securities issued by Teladoc." Further, it stated that under the purported Insider Trading Compliance Policy "Company officers, directors and employees are prohibited from engaging in hedging transactions, including purchasing Teladoc stock on margin or engaging in transactions in puts, calls or other derivative securities designed to hedge or offset any decrease in the market value of Teladoc's equity securities."

85.     These statements were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that: (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies was inadequate to prevent the foregoing conduct. Defendants failed to disclose clear violations of the CBCE and failed to disclose that Hirschhorn's misbehavior put him at risk of losing his job.

**Defendants' Misconduct Adversely Affected Teladoc's Value**

86.     Studies have shown that "[a] company's intangible assets, which include human capital and culture, are now estimated to comprise on average 52% of a company's market value."[4] Accordingly, Teledoc's reputation for integrity and reliability, as reflected in its CBCE, was part of its brand and an asset. Indeed, in the 1990s, adoption and enforcement of such codes was encouraged as defense in the event of uncovering corporate criminal misconduct by the future SEC

---

[4]     Global Intangible Finance Tracker (GIFT)™ 2018, October 2018. https://brandfinance.com/knowledge-centre/market-research/global-intangible-finance-tracker-gift-20181/, accessed October 2019.

Chairman Harvey Pitt.  *See Minimizing Corporate Civil and Criminal Liability: A Second Look at Corporate Codes of Conduct*, 78 Geo. L.J. 1559, 1600.  This principle is now encoded in the Federal Sentencing Guidelines, Guidelines Manual Sec. 8B2.1 (2018).

87.     Thus, a company's reputation is valuable as a marketing tool to customers, relied upon by banks in extending credit, and thus by investors who presume that the CBCE reflects not merely aspirations (nor guarantees) but affirmative representations of Company behavior, departures from which are material to investors.  The "value" of that reputation was "baked into" Teledoc's stock price.  This principle is best evidenced by the materially significant decline in the price of the Company stock following revelation of the misconduct.  Indeed, the Company's stock price did not decline because there was a restatement of prior financial results.  Rather, the revelation of misconduct indicated that management was no longer reliable, and investors needed to assign a higher risk premium to the stock, thereby reducing its value.  Teledoc's price reaction is consistent with empirical studies on the value of a company's reputation.  *See* Jonathan M. Karpoff, D. Scott Lee & Gerald S. Martin, *The Cost to Firms of Cooking the Books*, 43 J. Fin. & Quantitative Analysis 581, 581 (2008)); Shui -Yik Au et al., *How Much Does Workplace Sexual Harassment Hurt Firm Value*, ssm.com./abstract=3437444.  Accordingly, it is reasonable for investors to assume that companies will meaningfully enforce such codes of conduct.

**The Stock Sales by Company Executives Support a Strong Inference of Scienter**

88.     Teladoc insiders collectively sold more than 1.4 million shares of Company stock during the Class Period for proceeds of more than $53 million.  For example, during the Class Period, Defendant Hirschhorn sold 615,000 shares of Teladoc stock for proceeds of $22,873,284.  The following chart sets forth Defendant Hirschhorn's stock sales during the Class Period:

| TRANSCATION DATE | NUMBER OF SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|
| August 15, 2016 | 30,000 | $17.83 | $534,900.00 |
| October 17, 2016 | 5,000 | $15.52 | $77,600.00 |
| November 8, 2016 | 700 | $17.50 | $12,250.00 |
| November 10, 2016 | 4,300 | $17.50 | $75,250.00 |
| November 15, 2016 | 5,000 | $16.82 | $84,100.00 |
| November 16, 2016 | 5,000 | $17.55 | $87,750.00 |
| December 15, 2016 | 5,000 | $16.60 | $83,000.00 |
| January 9, 2017 | 5,000 | $17.50 | $87,500.00 |
| January 17, 2017 | 10,000 | $17.84 | $178,400.00 |
| January 26, 2017 | 900 | $20.00 | $18,000.00 |
| April 19, 2017 | 59,100 | $25.46 | $1,504,686.00 |
| May 17, 2017 | 100,000 | $27.70 | $2,770,000.00 |
| September 21, 2017 | 15,900 | $31.46 | $500,214.00 |
| September 22, 2017 | 9,100 | $32.74 | $297,934.00 |
| October 2, 2017 | 10,000 | $34.04 | $340,400.00 |
| October 16, 2017 | 25,000 | $32.37 | $809,250.00 |
| October 17, 2017 | 10,000 | $34.03 | $340,300.00 |
| November 15, 2017 | 10,000 | $27.96 | $279,600.00 |
| December 4, 2017 | 30,000 | $32.99 | $989,700.00 |
| February 28, 2018 | 100,000 | $39.60 | $3,960,000.00 |
| May 1, 2018 | 40,000 | $42.67 | $1,706,800.00 |
| May 2, 2018 | 29,460 | $45.17 | $1,330,708.20 |
| May 2, 2018 | 30,540 | $45.17 | $1,379,491.80 |
| July 10, 2018 | 20,000 | $63.00 | $1,260,000.00 |
| September 25, 2018 | 25,000 | $80.45 | $2,011,250.00 |
| September 25, 2018 | 5,000 | $80.34 | $401,700.00 |
| September 25, 2018 | 5,000 | $80.32 | $401,600.00 |
| November 2, 2018 | 10,000 | $70.13 | $701,300.00 |
| December 4, 2018 | 10,000 | $64.96 | $649,600.00 |
| **TOTAL** | **615,000** | | **$22,873,284.00** |

89.     Defendant Hirschhorn's sales during the Class Period are suspicious because they represented more than 99% of his holdings.  Additionally, as the above chart reflects, Defendant Hirschhorn suspiciously sold 10,000 shares of his Teladoc shares on November 15, 2016 and November 16, 2016 while outside counsel was investigating his conduct – sales that were not conducted pursuant to any SEC Rule 10b5-1 trading plan.  Although some of Defendant Hirschhorn's other stock sales were made pursuant to an SEC Rule 10b5-1 trading plan, Defendant

Hirschhorn adopted and frequently amended the SEC Rule 10b5-1 trading plan during the Class Period for the purpose of taking advantage of the Company's inflated stock price. For example, Defendant Hirschhorn adopted his first SEC Rule 10b5-1 plan on September 16, 2016, when more people became aware of his improper relationship with Griffin. Additionally, Defendant Hirschhorn adopted new SEC Rule 10b5-1 trading plans *five times* in less than two years, and in one case, adopted a new plan one week after he adopted the previous plan.

90.     Other Teladoc executives also sold significant amounts of stock during the Class Period. For example, during the Class Period, Defendant Gorevic sold 594,991 shares of Teladoc stock for proceeds of $23,142,987.97. The following chart sets forth Gorevic's stock sales during the Class Period:

| TRANSCATION DATE | NUMBER OF SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|
| June 29, 2016 | 5,000 | $15.01 | $75,050.00 |
| July 15, 2016 | 5,000 | $15.45 | $77,250.00 |
| August 16, 2016 | 40,000 | $17.92 | $716,800.00 |
| January 24, 2017 | 100,000 | $15.79 | $1,579,000.00 |
| May 8, 2017 | 15,000 | $23.11 | $346,650.00 |
| May 22, 2017 | 4,700 | $29.58 | $139,026.00 |
| May 23, 2017 | 9,700 | $29.56 | $286,732.00 |
| May 25, 2017 | 5,600 | $29.57 | $165,592.00 |
| June 5, 2017 | 13,389 | $32.89 | $440,364.21 |
| June 6, 2017 | 6,602 | $32.88 | $217,073.76 |
| October 2, 2017 | 20,000 | $33.47 | $669,400.00 |
| November 2, 2017 | 20,000 | $32.10 | $642,000.00 |
| December 4, 2017 | 100,000 | $32.99 | $3,299,000.00 |
| March 12, 2018 | 40,000 | $43.27 | $1,730,800.00 |
| April 16, 2018 | 25,000 | $41.36 | $1,034,000.00 |
| May 15, 2018 | 25,000 | $48.93 | $1,223,250.00 |
| June 15, 2018 | 25,000 | $60.21 | $1,505,250.00 |
| July 16, 2018 | 25,000 | $66.11 | $1,652,750.00 |
| August 16, 2018 | 25,000 | $71.66 | $1,791,500.00 |
| September 17, 2018 | 25,000 | $75.05 | $1,876,250.00 |
| October 17, 2018 | 25,000 | $70.29 | $1,757,250.00 |
| November 19, 2018 | 35,000 | $54.80 | $1,918,000.00 |
| **TOTAL** | **594,991** | | **$23,142,987.97** |

91.     Defendant Gorevic's suspicious stock sales were also timed to maximize profit from Teladoc's artificially inflated stock price.  Additionally, Defendant Gorevic's stock sales represented approximately 53% of his holdings.  Defendant Gorevic's sales are even more suspicious considering that he was aware of the internal investigation regarding the improper relationship between Hirschhorn and Griffin.  Although some of Defendant Gorevic's stock sales were made pursuant to an SEC Rule 10b5-1 trading plan, Defendant Gorevic also adopted and amended the SEC Rule 10b5-1 trading plan during the Class Period for the purpose of taking advantage of the Company's inflated stock price.

92.     Similarly, Teladoc's Chief Legal Officer Vandervoort sold 200,243 shares of Teladoc stock for proceeds of $7,543,955.14 during the Class Period.  The following chart sets forth Vandervoort's stock sales during the Class Period:

| TRANSCATION DATE | NUMBER OF SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|
| August 8, 2016 | 52,865 | $16.64 | $879,673.60 |
| August 7, 2017 | 53,806 | $30.92 | $1,663,681.52 |
| March 2, 2018 | 27,809 | $38.62 | $1,073,983.58 |
| March 5, 2018 | 17,361 | $40.28 | $699,301.08 |
| March 5, 2018 | 1,953 | $41.82 | $81,674.46 |
| July 9, 2018 | 24,250 | $64.28 | $1,558,790.00 |
| August 8, 2018 | 5,549 | $67.25 | $373,170.25 |
| September 10, 2018 | 5,550 | $77.67 | $431,068.50 |
| October 8, 2018 | 5,551 | $73.83 | $409,830.33 |
| November 8, 2018 | 5,549 | $67.18 | $372,781.82 |
| **TOTAL** | **200,243** | | **$7,543,955.14** |

93.     Chief Legal Officer Vandervoort's Teladoc stock sales were also timed to maximize profit from Teladoc's artificially inflated stock price.  Suspiciously, Chief Legal Officer Vandervoort's stock sales represented more than 99% of his holdings.  Chief Legal Officer Vandervoort's sales are even more suspicious considering that he interviewed the employees who reported Defendant Hirschhorn's improper relationship.  Although some of Chief Legal Officer

Vandervoort's stock sales were made pursuant to an SEC Rule 10b5-1 trading plan, Chief Legal Officer Vandervoort adopted the SEC Rule 10b5-1 trading plan during the Class Period for the purpose of taking advantage of the Company's inflated stock price.

## CLASS ACTION ALLEGATIONS

94.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

95.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.    Plaintiffs' claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

97.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)     whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)     whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION**

100.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period

purchasers of the Company's common stock by failing to disclose, and misrepresenting, the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's common stock declined significantly as the prior artificial inflation dissipated from the Company's stock price.

101.    Specifically, in response to the publication of the SIRF Report revealing Hirschhorn's improper relationship and Teladoc's culture of misconduct, Teladoc's stock price fell sharply by $4.00, or 6.69%, to close at $55.81 on December 6, 2018.

102.    As a result of the purchases of the Company's common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss (damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect, and caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period.

103.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly.  These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

104.    The declines in the price of the Company's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by

Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

105.   The economic loss (damages) suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

106.   At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)   The Company's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)   As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)   The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

107.   As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available sources and

reflected such information in the prices of the Company's stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

108.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

109.    Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein.

110.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not

knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

112.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.  Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

113.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

114.    Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein.

115.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC

and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

116.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

117.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

118.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs, and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  December 30, 2020

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Ex Kano S. Sams II*
Ex Kano S. Sams II (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150
esams@glancylaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com

Leah Heifetz-Li
101 Greenwood Avenue, Suite 440
Jenkintown, Pennsylvania 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
lheifetz@rosenlegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman
Cara David
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
cdavid@pomlaw.com

Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Lead Plaintiffs Wayne Arcuri,*
*Badruddin Salimbhai, and David Williams*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On December 30, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 30, 2020.

*s/ Ex Kano S. Sams II*
 Ex Kano S. Sams II