USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______________
DATE FILED: 9/8/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JON REINER, et al.,

Plaintiffs,

-against-

TELADOC HEALTH, INC., JASON GOREVIC, and MARK HIRSCHHORN,

Defendants.

18-CV-11603 (GHW) (BCM)

**REPORT AND RECOMMENDATION TO THE HON. GREGORY H. WOODS**

**BARBARA MOSES, United States Magistrate Judge.**

Beginning in 2014, defendant Mark Hirschhorn, a senior executive at defendant Teladoc Health, Inc. (Teladoc or the Company), had an extra-marital affair with a lower-level Teladoc employee, Charece Griffin, "causing drama" in her department. When the Board of Directors learned about the affair in 2016, it retained counsel, investigated, and disciplined Hirschhorn, but did not discharge him. In 2018, when the affair and the Company's response became public, the price of Teladoc's stock dropped, the Company entered into a separation agreement with Hirschhorn, and litigation ensued. In this action, lead plaintiffs Wayne Arcuri, Badruddin Salimbhai, and David Williams, suing on behalf of themselves and all others similarly situated, allege that Teladoc, Hirschhorn, and Teladoc's Chief Executive Officer (CEO) Jason Gorevic engaged in securities fraud from March 3, 2016 through December 5, 2018 (the Class Period) by making false or misleading statements regarding (1) the Company's commitment to ethical governance, as set forth in its Code of Business Conduct and Ethics (CBCE); and (2) the risks arising from the Company's dependence on its senior management team.

In a Memorandum Opinion and Order dated November 30, 2020 (Op. & Order) (Dkt. No. 70),[1] which adopted, in part, my Report and Recommendation dated September 9, 2020 (R&R)

[1] *Reiner v. Teladoc Health, Inc.*, 2020 WL 7028638 (S.D.N.Y. Nov. 30, 2020).

(Dkt. No. 65),[2] the Hon. Gregory H. Woods, United States District Judge, dismissed plaintiffs' Second Amended Consolidated Class Action Complaint (SAC) (Dkt. No. 35) in its entirety, with leave to amend. The District Judge concluded, among other things, that most of the challenged statements in or about the CBCE were inactionable "puffery," too insubstantial to be the basis of a securities fraud claim, and that as to two statements capable of being proven true or false, plaintiffs failed to allege facts showing that they were either false or misleading. Op. & Order at 7-10. As to the "key personnel" disclosures, the District Judge adopted, without modification, the R&R's conclusion that Teladoc's statements, which did not mention Hirschhorn by name, "were 'not misleading for having omitted unadjudicated allegations that might one day lead to his ouster.'" R&R at 26 (quoting *Okla. Law Enf't Ret. Sys. V. Papa John's Int'l Inc.*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020) (*Papa John's I*)); Op. & Order at 5. Additionally, the District Judge agreed with the R&R that, in the absence of any actionable misstatement or omission, there was no need to reach the issue of scienter, and that because plaintiffs had not pled a primary securities fraud violation, their claim for control person liability also failed. R&R at 26; Op. & Order at 5.

Now before me for report and recommendation is defendants' motion (Dkt. No. 76) to dismiss the Third Amended Consolidated Class Action Complaint (TAC) (Dkt. No. 71), with prejudice, on substantially the same grounds asserted against the SAC. Moving pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. §§ 78u-4 *et seq*., defendants argue that plaintiffs fail to plead any materially false or misleading statement; that they fail to plead particularized facts giving rise to a strong inference of scienter; and that their control person claim should be dismissed for failure to plead a

[2] *Reiner v. Teladoc Health, Inc.*, 2020 WL 6343217 (S.D.N.Y. Sept. 4, 2020), *report and recommendation adopted as modified,* 2020 WL 7028638 (S.D.N.Y. Nov. 30, 2020).

primary securities fraud violation. I agree with defendants that, after four tries, plaintiffs have failed to allege any materially false or misleading statement by any defendant. For this reason, as discussed in more detail below, I recommend that defendants' motion be granted.

## I. BACKGROUND

### A. Procedural History

Plaintiffs filed the TAC on December 30, 2020. Count I alleges that defendants violated § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and Securities and Exchange Commission (SEC) Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II alleges that the individual defendants – Gorevic and Hirschhorn – are liable for any false or misleading statements disseminated by the Company because they are control persons pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants filed their motion to dismiss the TAC on February 12, 2021, supported by a memorandum of law (Def. Mem.) (Dkt. No. 77) and the Declaration of Audra J. Soloway (Soloway Decl.) (Dkt. No. 78), attaching various SEC filings and related documents. On March 26, 2021, plaintiffs filed their opposition memorandum (Pl. Opp.) (Dkt. No. 79), accompanied by the Declaration of Leah Heifetz-Li (Heifetz-Li Decl.) (Dkt. No. 80), attaching one additional SEC filing by the Company. On April 23, 2021, defendants filed their reply brief. (Def. Reply) (Dkt. No. 83.)

### B. Repleaded Allegations

Most of the factual allegations in the TAC were previously asserted in the SAC and are detailed in the R&R, at 5-12, familiarity with which is assumed. Consequently, I summarize those allegations only briefly in the sections that follow. As required by *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007), I accept the well-pleaded factual allegations contained in the TAC as true for purposes of the motion to dismiss.

**1. Events**

Teladoc is a publicly-traded Delaware corporation providing telehealth services. TAC ¶¶ 2, 21. Defendant Gorevic served, at all relevant times, as the company's CEO. *Id.* ¶ 22. Defendant Hirschhorn became the company's Executive Vice President and Chief Financial Officer (CFO) in October 2012. *Id.* ¶ 31.

In May 2014, Hirschhorn began a relationship with Griffin, who worked in the Company's Lewisville, Texas office. TAC ¶¶ 4, 13. Thereafter, Griffin "received a series of promotions" over colleagues with "either more industry experience or better credentials," and her compensation grew to "about $125,000." *Id.* ¶ 13. The affair spanned at least two years, *id.* ¶¶ 35, 37, and was an open secret in Lewisville, where Griffin "regularly discussed her relationship with Hirschhorn." *Id.* ¶¶ 4, 30-33. Griffin also told her colleagues that she and Hirschhorn liked to trade Teladoc stock together. *Id.* ¶¶ 13, 35. "More accurately, after Griffin received a stock grant, Hirschhorn would tell her when he thought there were good opportunities to sell some shares." *Id.* ¶ 35.

On September 28, 2016, Hirschhorn was promoted to Chief Operating Officer (COO), while retaining his CFO title. TAC ¶ 63.

Griffin's "ultimate boss" Amy McKay reported the improper relationship to Pina Tripodi and Theresa Kirk-Fowler, Teladoc's Director and Associate Director of Human Resources (HR), respectively, TAC ¶¶ 5, 42, as did an individual identified as Former Employee 2 (FE2). *Id.* ¶ 42. In October 2016, McKay drafted, and submitted to the Legal and HR departments, an eight-page document setting forth the timeline of the relationship and detailing the "complaints of unfairness" raised by other employees regarding Griffin's stock trading. *Id.* ¶¶ 6, 43.

Beginning in early October 2016, several Teladoc employees, including McKay, received harassing emails from fake email addresses. SAC ¶¶ 7, 45. Two of the recipients filed police reports (at Kirk-Fowler's suggestion), suggesting that Griffin may have sent the emails. TAC ¶¶ 7,

45-48, Exs. B, C. However, after interviewing Griffin, the police closed both cases without further action. *Id*. Exs. B, C.

In November 2016, McKay learned that the Company had retained a law firm to investigate her allegations. TAC ¶¶ 9, 49. The investigation substantiated those allegations and revealed "inappropriate conduct" by Hirschhorn, but defendants "failed to act to ensure that investors would not be harmed." *Id*. ¶¶ 9, 49-50. Instead, on December 27, 2016, Teladoc entered into an amended employment contract with Hirschhorn containing only "minor slaps on the wrist." *Id*. ¶ 9, 50.[3]

In October 2017, McKay was fired, albeit with a "severance package," after spending "months 'bitterly complaining and arguing with the HR and Legal departments'" about the Hirschhorn decision. TAC ¶¶ 13, 35, 51.[4] In addition, FE2 was bullied by a manager who reported to Hirschhorn. *Id*. ¶ 52.[5] Griffin "resigned quietly in late 2017." *Id*. ¶¶ 13, 45, 51. Hirschhorn retained his position at Teladoc for another two years, until the Southern Investigative Research Foundation published an expose of the Hirschhorn-Griffin affair (the SIRF Report) on December 5, 2018, *id*. ¶¶ 13, 33, 35 & Ex. A, after which the price of Teladoc's common stock dropped by $4 per share (6.69%). *Id*. ¶ 13. On December 17, 2018, Hirschhorn resigned. *Id*. ¶ 14.

---

[3] The TAC (like the SAC) alleges that Hirschhorn's only punishment was that his amended contract prohibited him from violating the employee handbook and suspended his scheduled share vesting for one year. TAC ¶ 50. However, as discussed in the R&R (at 7 n.5), Hirschhorn also forfeited his cash bonus for 2016. *See* Soloway Decl. Ex. 3, at ECF page 7 (showing that Hirschhorn received a total of $400,495 in "Bonus" and "Non-Equity Incentive Plan Compensation" for 2015, zero for 2016, and $476,196 for 2017).

[4] McKay was replaced by an unqualified manager, whose team "did not know how to credential doctors" and "resorted to falsifying documents," which ultimately led, in 2019, to the temporary downgrading of Teladoc's accreditation status with "an outside entity that provides accreditation to healthcare companies." TAC ¶¶ 54-60.

[5] The SAC alleged that FE2 was ultimately fired, in 2018, by that manager. SAC ¶ 45. This allegation does not reappear in the TAC.

In the wake of the SIRF Report, CEO Gorevic falsely told analysts that Teladoc was not aware of the inappropriate relationship between Hirschhorn and Griffin when Hirschhorn was promoted to COO on September 28, 2016, and that McKay was not terminated for reporting the relationship. TAC ¶¶ 8, 61-64.[6]

Over the course of the approximately 2-1/2 year Class Period, *see* TAC ¶ 1, Hirschhorn sold Teladoc stock representing a total of more than 99% of his holdings. *Id.* ¶ 89. Gorevic also sold large amounts of stock, as did Adam Vandervoort, Teladoc's Chief Legal Officer (CLO), who is not a defendant. *Id.* ¶¶ 90-93.

**2. Statements**

During the Class Period, the Company made a number of public statements – in its proxy statements and on its website – about its "integrity" and "ethics," frequently highlighting its CBCE. TAC ¶¶ 68-70, 75-77, 81-83. For example, in its April 15, 2016 proxy statement, Teladoc stated that it was "committed to the highest standards of integrity and ethics in the way it conducts business." TAC ¶ 68. The 2016 proxy statement went on to explain that the CBCE, adopted in 2015, "applies to all of our employees, officers and directors, including our chief executive officer, chief financial officer, and all other executive and senior officers." *Id.* ¶ 69. Teladoc described the CBCE as "establish[ing] our policies and expectations with respect to a wide range of business conduct," including "our compliance with laws and possible conflicts of interest," and noted that, "each of our directors and employees is required to report suspected or actual violations." *Id.* Teladoc made similar statements in its 2017 and 2018 proxy statements, *id.* ¶¶ 75-76, 81-82, and "touted the CBCE" by directing readers to its website, where a full copy was available. *Id.* ¶¶ 70,

[6] Plaintiffs do not specify the date on which these statements were made. It is therefore unclear whether they were made during the Class Period, which ended on the day the SIRF Report was published. TAC ¶ 1.

77, 83. The 2018 proxy statement also stated that Teladoc maintained an "Insider Trading Compliance Policy" which, among other things, prohibited the Company's officers, director, and employees from engaging in hedging transactions designed to "offset any decrease in the market value of Teladoc's equity securities." *Id.* ¶ 84. In an earnings call on March 1, 2017, Gorevic stated that Teladoc was "continuing to enhance [its] overall corporate governance program." *Id.* ¶ 73.

Plaintiffs allege that all of these statements were materially false and misleading because defendants failed to disclose that:

> (1) Hirschhorn, one of the Company’s most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company’s operations; and (4) the Company’s enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct.

TAC ¶¶ 72, 74, 78, 85.

Defendants also made statements, during the Class Period, about the Company's dependence on its "key executives." TAC ¶ 65. In its 2015 annual report on Form 10-K, the Company stated, "[w]e depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business." *Id.* The 2015 10-K went on to state that "changes in our executive management team" could "disrupt our business," *id.*, and that any "employment claims . . . may result in substantial costs and may divert management’s attention and resources." *Id.* ¶ 66. Similar statements were made in Teladoc's 2016 and 2017 10-Ks. *Id.* ¶¶ 73, 79.

According to plaintiffs, these "key personnel" statements were materially false and misleading for the same reasons cited in connection with the ethics-related statements; that is, because defendants failed to disclose that:

> (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct.

TAC ¶¶ 67, 74, 80.

### C. New Allegations

The TAC provides additional detail about how Teladoc personnel in the Lewisville office discovered the Hirschhorn-Griffin affair, when and by whom it was reported to HR, and the retaliation they experienced. An individual identified as Former Employee 1 (FE1) "personally became aware" of the relationship in August or September 2015 when FE1 saw the couple "cuddled together in a booth at a restaurant," and "reported the sighting to McKay." TAC ¶¶ 36, 39. Additionally, according to FE1, Griffin "was always getting flowers at the office and . . . most people suspected the flowers were from Hirschhorn." *Id.* ¶ 39. FE2 also knew about the Hirschhorn-Griffin relationship – because Griffin told FE2 about it in August or September 2015. *Id.* ¶ 37. Another employee in the Lewisville office, Former Employee 3 (FE3), "personally observed Griffin openly discussing her relationship with Hirschhorn with colleagues." *Id.* ¶ 38.

In "late 2015 or early 2016," McKay reported the relationship to Tripodi by telephone, stating that it was "causing drama in her department" and the situation was "basically becoming unmanageable." TAC ¶ 5, 40, 42. Tripodi said that she "did not believe McKay," and suggested that "maybe McKay needed to find a new job." *Id.* ¶¶ 5, 40, 62. "FE2 also reported the improper relationship, including allegations of insider trading, to Tripodi and Kirk-Fowler." *Id.* ¶ 42. Thereafter, FE2 "experienced severe retaliation" from FE2's manager, Vice President of Operations Garry Britton, who (along with his team) "bullied FE2 constantly" and "raked [FE2]

through the coals" at weekly meetings. *Id.* ¶ 52. FE2 reported this to Tripodi, who claimed that she would investigate, but "the retaliation continued." *Id.*[7]

The TAC also identifies four additional statements, all contained in § 10 of the CBCE itself, that plaintiffs now expressly allege to be materially false or misleading:

First, that "[a]ll employees, officers and directors are expected to comply with all of the provisions of this Code," TAC ¶ 11;

Second, that the CBCE "will be strictly enforced throughout the Company and violations will be dealt with immediately, including subjecting persons to corrective and/or disciplinary action such as dismissal or removal from office," *id.*;

Third, that "[t]he Company encourages all employees, officers and directors to report any suspected violations promptly and intends to thoroughly investigate any good faith reports of violations," *id.*; and

Fourth, that "[t]he Company will not tolerate any kind of retaliation for reports or complaints regarding misconduct that were made in good faith." *Id.*[8]

Additionally, the TAC alleges that the value of Teladoc's stock rests significantly on its "reputation for integrity and reliability, as reflected in its CBCE," thus explaining why the price of

---

[7] There is no allegation that Britton – or anyone else who treated FE2 badly – stated or implied that they knew that FE2 had reported the Hirschhorn-Griffin relationship to HR. However, the TAC explains, FE2 "believes" that "Tripodi told Britton that FE2 had reported Hirschhorn's improper relationship to HR," and further "believes" that Britton, who reported to Hirschhorn, "wanted to protect Hirschhorn." TAC ¶ 52. The TAC does not set forth the basis of FE2's belief.

[8] In addition to identifying these specific statements, plaintiffs reprint the current version of the CBCE verbatim in ¶ 71 of the TAC and claim in ¶ 72 that "all" of the statements therein (comprising almost six pages) are "materially false and misleading." As plaintiffs confirm in their opposition brief, however, they did not intend this allegation to be read literally. Pl. Opp. at 9 n.3. Consequently, I focus here on the "elements of the CBCE," *id.*, that plaintiffs specifically identify as fraudulent outside of ¶ 71, and as to which they "explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

that stock declined upon publication of the SIRF Report even though the Company did not restate prior financial results. TAC ¶¶ 86-87.

Finally, the TAC includes expanded allegations concerning the stock sales by Hirschhorn, Gorevic, and Vandervoort, asserting that Hirschhorn sold 615,000 shares for proceeds of more than $22 million, TAC ¶¶ 88-89; that Gorevic sold almost 600,000 shares for proceeds of more than $23 million, *id.* ¶ 90; and that Vandervoort sold over 200,000 shares for proceeds of approximately $7.5 million. *Id.* ¶ 92. Although most of these sales were conducted pursuant to Rule 10b5-1 trading plans,[9] the trading was nonetheless "suspicious," plaintiffs allege, because Hirschhorn made two non-Rule 10b5-1 sales of 10,000 shares apiece on November 15 and 16, 2016, "while outside counsel was investigating his conduct," *id.* ¶ 89; Gorevic (like the rest of the Teladoc board) "was aware of the internal investigation regarding the improper relationship between Hirschhorn and Griffin," *id.* ¶ 91; and Vandervoort "interviewed the employees who reported" that relationship. *Id.* ¶ 93.[10] Plaintiffs further allege that all three executives adopted and/or amended their Rule 10b5-1 plans during the Class Period "for the purpose of taking advantage of the Company's inflated stock price." *Id.* ¶¶ 89, 91, 93. However, the TAC does not identify the dates on which the plans were adopted or amended, nor provide any other factual support for the allegation that they were adopted or amended for an unlawful purpose.

[9] SEC Rule 10b5-1 creates a defense to insider trading for individuals who purchase or sell securities pursuant to a predetermined, written plan. 17 C.F.R. § 240.10b5-1(c).

[10] The stock sale charts included in the TAC show that the price of Teladoc's common stock rose fairly steadily from $17.83 per share on August 15, 2016 (the date of Hirschhorn's first sale during the Class Period) to $64.96 on December 4, 2018 (the date of Hirschhorn's last sale during the Class Period). TAC ¶ 88. After the disclosure of the SIRF Report, the share price fell to $55.81 on December 6, 2018. *Id.* ¶ 101. Most of the sales alleged in the TAC – including all of the sales in 2016, 2017, and the first half of 2018 – were made at prices lower than $55.81. *Id.* ¶¶ 88-92.

## II. LEGAL STANDARDS

### A. Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." If that "short and plain statement" fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A court faced with a Rule 12(b)(6) motion must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy*, 482 F.3d at 191. However, "that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678) (alterations omitted). The courts need not and should not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

When resolving a Rule 12(b)(6) motion, "[i]n addition to the facts alleged in the complaint, courts 'may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2019 WL 1436993, at *6 (S.D.N.Y. Mar. 30, 2019) (Woods, J.) (quoting *ATSI*, 493 F.3d at 98).

### B. Rule 9(b) and the PSLRA

Plaintiffs asserting claims for securities fraud must also satisfy the heightened pleading requirements imposed by the PSLRA and Fed. R. Civ. P. 9(b). *Alpha Capital*, 2019 WL 1436993,

at *6; *ATSI*, 493 F.3d at 99. Under Rule 9(b), plaintiffs alleging fraud "must state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citing *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)).

The PSLRA imposes similar requirements on § 10(b) claims: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Alpha Capital*, 2019 WL 1436993, at *6 (quoting 15 U.S.C. § 78u-4(b)(1)). "The PSLRA further requires that the complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' with respect to each alleged misstatement or omission." *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)). In a Rule 10b-5 action, the "required state of mind" is an "intent to deceive, manipulate, or defraud," or "reckless conduct." *ATSI*, 493 F.3d at 99 n.3 (citations and quotation marks omitted). "A complaint will survive under that heightened standard 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Alpha Capital*, 2019 WL 1436993, at *6 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

**C. Section 10(b) of the Exchange Act and Rule 10b-5**

"To sustain a private cause of action for securities fraud under § 10(b) and Rule 10b-5, [plaintiffs] must adequately plead: (1) a material misrepresentation or omission by the

defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GE Invs. v. General Elec. Co*., 447 F. App'x 229, 231 (2d Cir. 2011) (summary order) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc*., 552 U.S. 148, 157 (2008)).

A statement is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available," *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 96 (1976)); that is, if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (quoting *Arzrielli v. Cohen Law Offs*., 21 F.2d 512, 518 (2d Cir. 1994)). To be actionable under § 10(b), "[t]he statement must also be 'mislead[ing],' evaluated not only by 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp*., 918 F.3d 57, 63 (2d Cir. 2019) (quoting *Operating Local 649 Annuity Tr. Fund*, 595 F.3d at 92)).

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see also In re Banco Bradesco S.A. Sec. Litig*., 277. F. Supp. 3d 600, 630 (S.D.N.Y. 2017) (Woods, J.) ("A corporation does not have a duty to disclose information simply because it is material."). "Similarly, a corporation does not have a duty to disclose information simply because it suggests the corporation or its employees engaged in uncharged illegal conduct." *Id*. at 631; *see also In re Citigroup, Inc. Sec. Litig*., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."). However, "[w]hen a corporation

does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." *In re Marsh & Mclennan Cos. Sec. Litig*., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (quoting *Roeder v. Alpha Indus., Inc*., 814 F.2d 22, 26 (1st Cir. 1987)). Thus, "courts presented with the specific context here – of undisclosed corporate malfeasance or allegations of the same – have held that disclosure was not required except where doing so was necessary to prevent the corporation's *other* statements from being misleading." *In re Braskem S.A. Sec. Litig*., 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (collecting cases). This rule applies in full to "disclosure of a company's violations of its internal code of conduct," which "is generally not required unless its absence renders any particular statement false or misleading." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *7 (S.D.N.Y. Apr. 14, 2020) (Woods, J.).

**D. Corporate Codes**

Corporate codes of conduct "tend to be 'general statements about reputation, integrity, and compliance with ethical norms [that] are inactionable puffery' – as opposed to being statements of facts – and are, therefore, generally incapable of forming the basis for a Section 10(b) claim," even where the company's stock price drops after the disclosure of code violations by senior corporate executives. *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 532 (S.D.N.Y. 2020) (quoting *Singh*, 918 F.3d at 63). As Judge Woods explained in *Banco Bradesco*, this principle "inheres in the fact that codes of conduct and other aspirational statements concerning compliance with the law do not guarantee that compliance will occur in every instance." 277 F. Supp. 3d at 658 (holding that company's Code of Ethical Conduct was not actionable because, "despite its relatively forceful wording," it remained "an aspirational and hortatory statement" that "made no guarantee that it would be followed" and contained no "representations of historical fact to the effect that its officers had uniformly abided by it"). *See also Braskem*, 246 F. Supp. 3d at 755-56 ("[b]ecause a code of ethics is inherently aspirational[,]

it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all") (internal quotation marks and citation omitted).

The same is ordinarily true for forward-looking statements about what a company will do to enforce its ethics code or protect those who report violations. *See*, *e.g.*, *Okla. Law Enf't Ret. Sys. v. Papa John's Int'l, Inc*., 517 F. Supp. 3d 196, 201 (S.D.N.Y. 2021) (*Papa John's II*) (statement that failure to comply with code "will subject a team member to corrective action" was too "vague," "broad" and "aspirational" to be actionable); *Ulbricht v. Ternium S.A.*, 2020 WL 5517313, at *5-6, 9 (E.D.N.Y. Sept. 14, 2020) (statement that "[f]ailure to comply with this Policy will be grounds for termination or other disciplinary action" was not actionable); *CBS*, 433 F. Supp. 3d at 533-34 (no reasonable investor would rely on corporation's assurances that it would take "remedial action" to stop sexual harassment or that those who reported harassment "will not be retaliated against"). Thus, the federal courts routinely dismiss securities fraud claims based on allegations that a company's failure to disclose violations of its ethics code rendered the code itself – or statements "touting" the code – materially misleading.[11]

However, "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *Banco Bradesco*, 277 F. Supp. 3d at 659 (quoting *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)). Thus, in "rare circumstances," courts "have allowed

---

[11] *See*, *e.g.*, *Singh*, 918 F.3d at 63 (2d Cir. 2019); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014); *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996); *Papa John's II*, 517 F. Supp. 3d at 207-10; *Papa John's I,* 444 F. Supp. 3d at 560-62; *Ulbricht*, 2020 WL 5517313, at *9; *Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 2020 WL 4937461, at *7 (S.D.N.Y. Aug. 24, 2020), *aff'd sub nom. Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 2021 WL 3744894 (2d Cir. Aug. 25, 2021); *Salim v. Mobile Telesystems PJSC*, 2021 WL 796088, at *10-11 (E.D.N.Y. Mar. 1, 2021); *CBS*, 433 F. Supp. 3d at 532-35; *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 505-14 (S.D.N.Y. 2017); *Braskem*, 246 F. Supp. 3d at 754-757; *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 28-30 (S.D.N.Y. 2016).

.

claims based on alleged misrepresentations contained in a code of ethics or code of conduct to survive a motion to dismiss." *Papa John's II*, 517 F. Supp. 3d at 201. For example – as relevant here – courts have allowed seemingly aspirational statements in a code of conduct to serve as the basis of a securities fraud claim where the well-pleaded facts alleged in the complaint showed (i) that the undisclosed code violations were so "pervasive" as to plausibly demonstrate that the company "in fact, held none of its asserted aspirations," *CBS*, 433 F. Supp. 3d at 533,[12] and (ii) that the company was "wielding its code of conduct to reassure investors that nothing was amiss when faced with suspicions of internal malfeasance." *Id*. at 532.[13]

[12] *See*, *e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *5-7, 17 (S.D.N.Y. Nov. 26, 2018) (*Signet I*) (statements in Signet's conduct and ethics codes "concerning [defendants'] policy and procedures against sexual harassment" were actionable where the complaint plausibly alleged a "culture of pervasive sexual harassment," which was "rampant at Signet at all levels, including among senior executives," and which was the subject of a pending arbitration proceeding, inadequately disclosed by Signet, in which over 200 employees had "detail[ed] their experiences" with sexual harassment at the company); *Banco Badesco*, 277 F. Supp. 3d at 660 (although anti-corruption policy itself was not actionable, statement in press release that Banco Bradesco had adopted an "effective" anti-corruption policy expressed more than "mere aspiration" and was actionable where "the highest levels of management" were "involved in bribery and corruption at the very same time" the statement was made).

[13] *See*, *e.g.*, *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 159-60 (E.D.N.Y. 2020) (statements in and about Tenaris's Code of Conduct "could be material" because, after a prior bribery scandal, Tenaris was subject to a Deferred Prosecution Agreement which required it to update its Code of Conduct annually and certify its compliance; under these circumstances, a reasonable investor, "perhaps doubtful in the wake of the SEC DPA that Tenaris conducted its business in accordance with the law, may have sought to allay these concerns by looking to the Code of Conduct's anti-bribery provision"), *reconsideration denied,* 2021 WL 2843204 (E.D.N.Y. July 1, 2021); *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019) (*Signet II*) (once again refusing to dismiss plaintiffs' claims where the challenged statements were issued "[i]n the face of a credible accusation . . . that Signet suffered from rampant sexual harassment," and were designed to "reassure the investing public that Signet did not, in fact, have a toxic workplace"), *reconsideration denied,* 2019 WL 2656338 (S.D.N.Y. June 20, 2019); *Banco Bradesco*, 277 F. Supp. 3d at 660 (permitting claims to proceed as to statements *about* Brazilian company's anti-corruption policy, which were "made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery," during a "time of concern" after public disclosure of a "vast" bribery investigation involving other Brazilian companies).

In such cases, it is not enough to assert in conclusory terms that code violations occurred. The predicate conduct – that is, the undisclosed conduct that allegedly violated the code – must be pleaded with the particularity required by Rule 9(b) and the PSLRA. *See*, *e.g.*, *Banco Bradesco*, 277 F. Supp. 3d at 631-32 ("Because the gravamen of the amended complaint is that a series of unlawful bribery schemes over the course of eleven years rendered the challenged statements false or misleading, the Court must determine at the outset whether Plaintiff has adequately alleged any or all of those schemes.").

**E. Section 20(a) of the Exchange Act**

Section 20(a) imposes liability on "control persons" – those who, "directly or indirectly, control[ ] any person liable under" the Exchange Act. 15 U.S.C. § 78t(a). To state a claim under § 20(a), a plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. "If a plaintiff has not adequately alleged a primary violation – that is, a claim under another provision of the Exchange Act – the derivative Section 20(a) claim must fall." *Papa John's II*, 2021 WL 371401, at *5.

## III. ANALYSIS

**A. Material Misstatement or Omission**

Because plaintiffs have failed to adequately to allege any material misstatement or omission, their § 10(b) and Rule 10b-5 claim should be dismissed.

**1. Some of the Predicate Misconduct Is Inadequately Pled**

As noted above, plaintiffs repeatedly allege that defendants' proxy statements, 10-Ks, and CBCE were false and misleading because Teladoc failed to disclose that:

> (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits;

> (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct.

TAC ¶¶ 67, 72, 74, 78, 80, 85.[14] As to the most serious charge, however – that Hirschhorn and Griffin "engaged in insider trading" – the TAC is wholly conclusory. Plaintiffs frequently use the phrase "insider trading," *see* TAC ¶¶ 12, 34, 42, 67, 72, 74, 78, 80, 8 (including in their brief, *see* Pl. Opp. at 1, 2), but utterly fail to plead its necessary components.

Insider trading is "unlawful trading in securities based upon material non-public information." *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012). Under both the "classical" and the "misappropriation" theories of insider trading, the charge "requires that the trading occur on the basis of 'material, nonpublic information.'" *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 430 (S.D.N.Y. 2015) (quoting *Obus,* 693 F.3d at 284); *see also S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 541-42 (S.D.N.Y. 2009) (under either theory, the plaintiff must prove that the defendant acted on the basis of, or revealed, "material, nonpublic information").

In the TAC, plaintiffs allege that Hirschhorn and Griffin "liked to trade Teladoc Health's stock together"; specifically, that after Griffin received a stock grant, Hirschhorn told her "when he thought there were good opportunities for [her] to sell Company shares." TAC ¶¶ 13, 35. Plaintiffs add that Hirschhorn had a "pretty good" track record, and that he gave Griffin money ($10,000, according to FE1) to trade (unspecified) stocks. TAC ¶¶ 4, 13, 35, 41. Nowhere, however, do they allege that Hirschhorn disclosed or used any "material, nonpublic information"

---

[14] *See also* TAC ¶ 12 (varying the language of the fourth clause to read, "(4) the Company's enforcement, including the firing of whistleblowers, of its own purported employment and trading policies was inadequate to prevent the foregoing conduct," and adding a redundant fifth clause: "(5) as a result, the Company's public statements were materially false and misleading at the time they were made.").

when giving Griffin investment advice, much less describe that information, or identify any specific trade based upon it. Consequently, plaintiffs have not adequately pleaded that any insider trading occurred. *See*, *e.g*., *Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at *11 (D. Conn. Mar. 10, 2015) (dismissing insider trading claim where plaintiff shareholders failed to "identify any dates, particular sellers, shares sold, or the existence of nonpublic information about the company's value that was known at the relevant times and not disclosed"), *aff'd,* 658 F. App'x 5 (2d Cir. 2016); *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001) (dismissing insider trading claim where plaintiff "failed to provide adequate specifics" concerning "[d]efendants' possession of non-public information," such as "what non-public information [p]laintiff gave [d]efendants, when the information was given, etc."); *Stromfeld v. Great Atl. & Pac. Tea Co.*, 496 F. Supp. 1084, 1087 (S.D.N.Y.) (dismissing insider trading claim where the complaint "fails to identify with any specificity the material inside information that purportedly should have been but was not disclosed"), *aff'd,* 646 F.2d 563 (2d Cir. 1980).

"[W]here, as here, securities fraud claims are based on failure to disclose uncharged illegal conduct, 'the complaint must state a plausible claim that the underlying conduct occurred.'" *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 803 (S.D.N.Y. 2018) (quoting *Menaldi v. Och-Ziff Capital Mgmt. Group LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016)); *accord Mucha v. Volkswagen Aktiengesellschaft*, 2021 WL 2006079, at *12 (E.D.N.Y. May 20, 2021); *Banco Bradesco*, 277 F. Supp. 3d at 631-32; *JP Morgan Chase Sec. Litig*., 363 F. Supp. 2d at 632. Thus, "in order to state a claim that defendants violated the securities laws because they failed to disclose [an] insider trading scheme, plaintiffs must plead the alleged trading scheme with particularity." *In re FBR Inc. Sec. Litig*., 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008). Plaintiffs here having failed to do so, Teladoc's proxy statements, 10-Ks, and CBCE cannot have been rendered misleading by the

Company's failure to "disclose" that Hirschhorn and Griffin "engaged in insider trading."[15] Consequently, the remaining questions for this Court are whether any of the challenged statements were (a) actionable and (b) rendered misleading by the Company's failure to disclose (i) the Hischhorn-Griffin affair and (ii) Griffin's undeserved promotions, or by its failure to confess that its policies "were inadequate to prevent the foregoing conduct." TAC ¶¶ 67, 72, 74, 78, 80, 85.

### 2. The Statements Previously Found to be Non-Actionable or Not Misleading Are Still Non-Actionable or Not Misleading

Defendants are correct that nothing in the TAC should alter the Court's conclusion with regard to the statements that plaintiffs identified in the SAC – and identify again in the TAC – as misleading. As to most of these statements, the R&R found, and the District Judge agreed, that they are "precisely the type of 'standard and vague assurances' that the courts routinely find too insubstantial to be the basis of a securities fraud claim, because 'no reasonable investor could have relied on them.'" R&R at 18 (quoting *Papa John's I*, 444 F. Supp. 3d at 560); *see also* Op. & Order at 7.[16] These are quintessentially "hazy" statements about the company's general commitment to

---

[15] Plaintiffs twice allege, in conclusory terms, that Teladoc "allowed violations of employment discrimination laws" and "sexual harassment laws." TAC ¶¶ 4, 34. No supporting facts are pled, however, and there is no allegation that any of the challenged statements made by Teladoc in its SEC filings or CBCE were false or misleading because Teladoc failed to disclose violations of "employment discrimination laws" or "sexual harassment laws." Instead, as noted above, the TAC expressly alleges that those statements were false or misleading because Teladoc failed to disclose four specific facts about Hirschhorn: that he had an inappropriate relationship with Griffin; that he engaged in insider trading with Griffin; that he got her promoted over more qualified employees; and that the Company's enforcement of its own policies was inadequate "to prevent the forgoing conduct." TAC ¶¶ 67, 72, 74, 78, 80, 85.

[16] Statements in this category include the Company's assertions that it was "committed" to the "highest standards of integrity and ethics," TAC ¶¶ 10, 32, 68; that the CBCE would "promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics," *id.* ¶ 75, 82; that the "purpose of this code is to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics," *id.* ¶¶ 76, 82; and that the CBCE "establishes our policies and expectations with respect to a wide range of business conduct." *Id.* ¶¶ 69, 76, 82.

high standards and ethical conduct, *Papa John's I*, 444 F. Supp. 3d at 560, expressly couched in "aspirational and hortatory language," *In re Banco Bradesco*, 277 F. Supp. 3d at 658, which for that reason do not, as a matter of law, "invite reasonable reliance." *CBS*, 433 F. Supp. 3d at 533.

Moreover, none of plaintiffs' new factual allegations demonstrate that this is one of the "rare" cases, *Papa John's II*, 2021 WL 371401, at *6, in which aspirational statements may be deemed misleading because of the context in which they were made. Nothing in the TAC suggests that Teladoc developed or deployed its CBCE "to quell a controversy," *Braskem*, 246 F. Supp. 3d at 757, "lull a discontented investor or regulator," *id*., or "reassure investors that no [Teladoc] executive, or its [COO] specifically, was susceptible" to accusations of CBCE violations. *CBS*, 433 F. Supp. 3d at 533. Moreover, the undisclosed misconduct that allegedly rendered the Company's statements false and misleading was a single "inappropriate" (but apparently consensual) relationship conducted between one senior executive and one "mid-level employee," TAC ¶ 35, which caused "drama" in the Lewisville office amidst claims of favoritism. *Id*. ¶ 5. This is a far cry from the "culture of pervasive sexual harassment" that was "rampant at Signet at all levels" and had already prompted over 200 employees to file affidavits in a pending arbitration, *see Signet I*, 2018 WL 6167889, at *5-7. It is even farther from the "eleven-year-long scheme, executed by [Banco Bradeco's] senior executives, of paying illegal bribes to public servants in exchange for illegally-obtained tax credits," *Banco Badesco*, 277 F. Supp. 3d at 624, which was ongoing when the company told the public that it had an "'effective' anti-corruption policy" in place. *Id*. at 660.

As to the Company's statements that its ethics code applies to "all of [Teladoc's] employees, officers, and directors," TAC ¶¶ 10, 32, 69, and that "each of our directors and employees is required to report suspected or actual violations" of the CBCE, *id*. ¶ 69, Judge Woods found that

they are statements of fact, which "can be demonstrably proven true or false," but concluded that plaintiffs did not allege that they were false; that is, the SAC did not allege "that the CBCE did not apply to everyone at Teladoc," Op. & Order at 8, or that some directors or employees were exempted from the reporting requirement.

Neither does the TAC. Rather, plaintiffs continue to allege (exactly as they did in the SAC) that defendants' statements to the effect that the CBCE applied to everyone are "misleading" because one officer – Hirschhorn – engaged in conduct that violated the CBCE, and because the Company's enforcement program was "inadequate" to prevent him from doing so. TAC ¶¶ 72, 78, 85. However, as Judge Woods explained when dismissing plaintiffs' last attempt to plead a § 10(b) claim based on these allegations, statements to the effect that a code of conduct applies to everyone "cannot be reasonably understood as a guarantee that every employee, officer, and director complied with the CBCE at all times." Op. & Order at 8; *see also ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (defendant's statements regarding its "discipline" and "integrity" did not "amount to a guarantee that its choices would prevent failures in its risk management practices"); *Braskem*, 246 F. Supp. 3d at 756 ("There is an important difference between a company's announcing rules forbidding [misconduct] and its factually representing that no officer has engaged in such forbidden conduct.").

Similarly, the statement that Teladoc's CBCE applied to "all" was not a guarantee that Hirschhorn would receive any particular punishment when his conduct was reported to and investigated by the Board of Directors in 2016. *See CBS*, 422 F. Supp. 3d at 534 (statements about CBS code of conduct, including that it applied to "all directors and employees of the Company," were inactionable because, among other things, they "describe no specific steps" and do not "elaborate on what exactly the Company would do to prevent or respond" to the proscribed

conduct). Thus, the allegation that Hirschhorn's penalty was too light ("two minor slaps on the wrist," TAC ¶¶ 9, 50) cannot support the conclusion that Teladoc committed securities fraud by stating that its CBCE "applies to all of our employees, officers and directors." TAC ¶ 69.

Accordingly, there is no reason for the Court to cast aside the law of the case as to any of the language in (and about) Teladoc's CBCE that plaintiffs first identified in the SAC and now recycle in hopes of a different result. *See Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y.) (law of the case doctrine "counsels against" revisiting prior rulings unless "[p]laintiff has offered new claims or factual allegations that arguably address the deficiencies the Court previously identified"), *aff'd,* 626 F. App'x 20 (2d Cir. 2015).

By the same token, plaintiffs present the Court with no reason to reconsider whether Teladoc's "key personnel" disclosures were misleading because the Company failed to announce that Hirschhorn had engaged in unadjudicated misconduct which might later result in his departure under a cloud. As explained in the R&R, those disclosures did not even mention Hirschhorn by name, did not "state or suggest that [Hirschhorn] had always behaved appropriately," and did not "purport to assess the likelihood that he would leave the Company or be implicated in accusations of misconduct." *CBS*, 433 F. Supp. 3d at 538. Absent any of these features, Teladoc's general statements to the effect that the loss of one or more of its executives "could adversely affect our business." TAC ¶ 66, were not rendered misleading "for having omitted unadjudicated allegations that might one day lead to [Hirschhorn's] ouster." *Papa John's I*, 444 F. Supp. 3d at 563.[17]

---

[17] In their brief, plaintiffs make no effort to defend their "key personnel" allegations as pled. Instead, they assert – for the first time – that Teladoc had a duty to disclose its 2016 investigation into Hirschhorn's conduct in its 2017 proxy statement and in a December 30, 2016 Form 8-K, because these filings disclosed the terms of the 2016 amendment to Hirschhorn's employment contract but failed to "tell investors the reason behind this change." Pl. Opp. at 13. The short answer to this theory is that the TAC does not identify the disclosures regarding Hirschhorn's amended contract as false or misleading. Indeed, plaintiffs discuss (and submit) the 2016 8-K for first time

**3. The Statements Newly Alleged to be Actionable and Misleading Are Also Non-Actionable or Not Misleading**

According to plaintiffs, the TAC improves upon the SAC by alleging "new false statements," as well as new factual allegations demonstrating their falsity. The "new false statements," all taken directly from the CBCE itself, are that "[a]ll employees, officers and directors are expected to comply" with the code; that it will be "strictly enforced," and violations "will be dealt with immediately"; that the Company "encourages all employees, officers and directors to report any suspected violations promptly and intends to thoroughly investigate any good faith reports of violations"; and that Teladoc "will not tolerate any kind of retaliation" for good-faith reports of misconduct. TAC ¶ 11. Plaintiffs contend that these statements are all "more than aspirational," Pl. Opp. at 8, and further argue that, "aspirational or not," they are misleading in context, because the "newly discovered information about retaliation" pleaded in the TAC shows that "the Company had no true intention of protecting whistleblowers." *Id.* at 10-11.

I disagree.

a) *The Newly-Alleged Statements Are Too General, Vague, and Aspirational to be Actionable as Securities Fraud*

Among the newly-alleged statements that plaintiffs characterize as materially false and misleading are the Company's statements, in its CBCE, as to what it "expects," "encourages," and "intends." Comparable language has frequently been held non-actionable, as "puffery," by multiple

in their opposition papers. *See* Heifetz-Li Decl. Ex. A. Consequently, "Lead Plaintiffs cannot rely on those statements in response to the motion to dismiss." Op. & Order at 6. Moreover, plaintiffs cite no authority, and I have found none, for the proposition that when a public company discloses a "material" change to an executive employment contract it must also "tell investors the reason behind this change." *See, e.g.*, *In re Liberty Tax, Inc. Sec. Litig.*, 825 F. App'x 747, 752 (2d Cir. 2020) (summary order) (statement that it was in company's "best interest" to terminate CEO Hewitt, which failed to add that "the true reason for Hewitt's termination was misconduct as revealed by a law firm's investigation," was not materially misleading).

courts in our Circuit. *See*, *e.g.*, *Tenaris*, 2020 WL 6018919, at *7 (statement that company "expects all of its employees" to abide by ethics code was an inactionable); *Papa John's I*, 444 F. Supp. 3d at 560-61 (statement in ethics code assuring employees that they had the "the right to expect Papa John's to conduct its business lawfully, responsibly and with the highest moral and ethical standards" was "not material" because it constituted "quintessential puffery"); *Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 404 (S.D.N.Y. 2018) (statements that employees were "expected to observe high standards of business and personal ethics" are "explicitly aspirational, describing only what employees are 'expected' to do"); *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 714, 718 (S.D.N.Y. 2018) (statements that "[e]mployees should report violations" of the code of ethics were not actionable); *Braskem*, 246 F. Supp. 3d at 754-55 (statement that company "encourage[es] the reporting of any illegal or unethical behavior" was immaterial puffery, while statement that employees were "expect[ed]" to adhere to the laws and the code of conduct was a "particularly inapt candidate to serve as the basis for § 10(b) liability").

The same is true regarding statements to the effect that a company will not "tolerate" specified forms of misconduct or retaliation against employees who report such misconduct. *See*, *e.g.*, *Fogel v. Vega*, 759 F. App'x 18, 21, 23-24 (2d Cir. 2018) (summary order) (statement that "[w]e do not tolerate . . . bribery, corruption or unethical practices" was not actionable); *CBS*, 433 F. Supp. 3d at 528-34 (statements in code of conduct that company "has a 'zero tolerance' policy for sexual harassment," that it "will not tolerate retaliation against any person who makes a good faith report of conduct," and that "those who report sexual harassment 'will not be retaliated against'" were not actionable, even in the face of allegations that whistleblowers were in fact ignored and retaliated against); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 298

(S.D.N.Y. 2019) (statement that the company "does not tolerate bribery" was not actionable); *Banco Bradesco*, 277 F. Supp. 3d at 657-58 (statements that bribery was "unacceptable" and "prohibited" were aspirational); *In re Sanofi Sec. Litig*, 155 F. Supp. 3d 386, 401-02 (S.D.N.Y. 2016) (statement that company had "zero tolerance for any unethical conduct" was puffery).

Similarly, forward-looking statements as to a company's commitment to "strict" enforcement of its ethics or conduct code have repeatedly been held inactionable as puffery where – as here – no specific result is promised. *See*, *e.g.*, *Papa John's II*, 517 F. Supp. 3d at 208 (statement that "[f]ailure to comply with the standards contained in this Code and other applicable policies and procedures will subject a team member to corrective action" is "vague, broad, and merely aspirational"); *Ulbricht*, 2020 WL 5517313, at *9 (statement in anti-bribery policy that "failure to comply . . . will be grounds for termination or other disciplinary action" was inactionable puffery); *CBS*, 433 F. Supp. 3d at 533-34, 538-39 (statement that CBS "take[s] swift action when we learn of unacceptable behavior" was "generic puffery," and, like statements in code itself that CBS will "promptly," "thoroughly," "timely," "fairly," and "completely" investigate allegations of sexual harassment, and "will take all steps and remedial action to stop sexual harassment," was not actionable where company did not say "what exactly the [it] would do to prevent or respond to workplace sexual harassment") (internal quotation marks omitted).

In their opposition brief, plaintiffs emphasize the newly-challenged statement that "all" Teladoc employees, officers and directors "are expected to comply with all of the provisions of this Code." Pl. Opp. at 8, 9. They argue that this statement, because of its language, "was not puffery." *Id*. at 9 & n.4 (noting that Judge Woods previously held that the statement that the CBCE

"applied to 'all of [Teladoc's] employees, officers, and directors' was not aspirational").[18] The newly-alleged statement, however, is expressly a statement of *expectation*, not a description of the terms of the CBCE. Moreover, it is functionally indistinguishable from the statement found aspirational – and non-actionable – in *Tenaris*, 2020 WL 6018919, at *7 ("Tenaris 'expects all of its employees . . . to comply with applicable law, deter wrongdoing and to abide by [Tenaris's] Code of Conduct.'"). *See also Ulbricht*, 2020 WL 5517313, at *9 (statement specifically advising that "Senior Financial Officers" will be "held accountable for their adherence to this Code of Ethics" was non-actionable); *CBS*, 433 F. Supp. 3d at 525, 528, 535 (statement that Supplemental Ethics Code for Senior Financial Officers was applicable to CEO was not misleading, even after CEO himself was forced out amidst revelations of his "dark history of sexual misconduct," where complaint did not allege "that those requirements were not in place," nor that "the Company guaranteed full compliance with the requirements contained in the Ethics Code").

In short, after carefully reviewing the statements newly alleged to be false or misleading, I conclude that because they are all "aspirational and hortatory," and because they neither "guarantee" that the CBCE will be followed nor make any "representations of historical fact to the effect that its officers had uniformly abided by it," *Banco Bradesco*, 277 F. Supp. 3d at 658, they are "too general and aspirational to invite reasonable reliance." *CBS*, 433 F. Supp. 3d at 533.[19]

---

[18] *See* Op. & Order at 7-8 (holding that this was "a statement of fact that can be demonstrably proven . . . false," if, for example, "by its terms, the CBCE did not apply to directors.").

[19] In the TAC, plaintiffs seemingly take issue with well-settled legal principle that "general and aspirational" statements in a company's code of ethics are ordinarily inactionable. Relying on several academic articles, they argue that since the value of a company's "reputation for integrity and reliability" is "baked into" its stock price (as evidenced by stock drops when ethics violations are uncovered), it is "reasonable for investors to assume that companies will meaningfully enforce [their] codes of conduct." TAC ¶¶ 85-87. In making this argument, however, "Plaintiffs conflate the importance of a [company's] reputation for integrity with the materiality of a [company's] statements regarding its reputation. While a [company's] reputation is undeniably important, that does not render a particular statement by a [company] regarding its integrity per se material." *ECA*,

b) *The Newly-Alleged Statements Are Not Misleading in Context*

In their opposition brief, plaintiffs assert that their new factual allegations – particularly the additional detail they offer regarding retaliation against McKay and FE2 – show that Teladoc "fail[ed] even to aspire to . . . enforcement . . . of its CBCE," Pl. Opp. at 9, thus demonstrating that the statements in the code "concerning retaliation against whistleblowers, encouragement of whistleblower reports, and the expectation that all directors and officers comply with ethics policies [were] not puffery." *Id.* (footnote omitted). According to plaintiffs, the "extent of the retaliation" against McKay and FE2 "shows that the Company had no true intention of protecting whistleblowers." *Id.* at 10. Thus, they conclude, this case "fit[s] squarely" within the *Signet* exception, *id.* at 11, under which even seemingly aspirational statements may serve as the basis of a securities fraud claim where the undisclosed violations were so "pervasive," *Signet I*, 2018 WL 6167889, at *5-7, as to plausibly demonstrate that the company "in fact, held none of its asserted aspirations," *CBS*, 433 F. Supp. 3d at 535.

Again, I disagree.

First, while plaintiffs' new theory of liability is clear – they reason that the statements in the CBCE regarding strict enforcement and protection of whistleblowers were misleading because the Company failed to disclose that in reality enforcement was lax, and whistleblowers were not protected – it is not the theory pleaded in the TAC. The TAC alleges, repeatedly, that the CBCE was misleading because Teladoc failed to disclose *Hirschhorn's misconduct*; that is, that:

---

553 F.3d at 206; *see also Lasker* 85 F.3d at 59 (acknowledging that the "financial integrity" of the defendant utility was important to investors while finding that the "broad, general" statements regarding its financial integrity at issue in that case could not reasonably be relied upon as a guarantee that the company's "actions would in no way impact [its] finances"); *Papa John's I* , 444 F. Supp. 3d at 561 ("The importance of [a company's] culture and reputation to its success does not mean that any statement lauding these intangibles was material under the securities laws.") (quoting *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016)).

> (1) Hirschhorn, one of the Company's most senior executives, was engaged in an inappropriate sexual relationship with a subordinate; (2) Hirschhorn and this subordinate engaged in insider trading to provide themselves with undue benefits; (3) Hirschhorn caused the subordinate to receive promotions for which she was unqualified, thereby negatively impacting the Company's operations; and (4) the Company's enforcement of its own purported employment and trading policies were inadequate to prevent the foregoing conduct.

TAC ¶¶ 67, 72, 74, 78, 80, 85. Only once, in ¶ 12, does the TAC mention "the firing of whistleblowers" in this context, and only as an example of the Company's broader failure to disclose that its enforcement was "inadequate" to prevent *Hirschhorn's misconduct*.

Plaintiffs' failure to articulate their current theory of liability in their pleading is reason enough to reject it. A securities fraud complaint must not only "specify the statements that the plaintiff contends were fraudulent" but also "explain why [those] statements were fraudulent." *ATSI*, 493 F.3d at 99; *see also Alpha Capital*, 2019 WL 1436993, at *6 (the PSLRA requires that the complaint "specify each statement alleged to have been misleading" as well as "the reason or reasons why the statement is misleading"). In this case, moreover, the District Judge gave plaintiffs leave to amend precisely because the SAC did not identify the statements that plaintiffs now contend to be actionable or "specify those statements as allegedly fraudulent, as required by Rule 9(b) and the PSLRA." Op. & Order at 6, 11. Plaintiffs having failed – on their fourth attempt – to do so, this Court is not required to evaluate a theory of liability outlined only in their brief in opposition to defendants' motion or give them a fifth opportunity to plead a case. *See CBS*, 433 F. Supp. 3d at 533 (where gravamen of case was the CBS failed adequately to disclose risk that its CEO would be ousted due to disclosure of extensive sexual misconduct, statements in its code of conduct as to what it would do to investigate sexual harassment and protect those who reported harassment from retaliation were "too general and disconnected from [p]laintiffs' central theory of securities fraud to be actionable").

Second, even if the TAC adequately signposted plaintiffs' new theory of "pervasive misconduct" based on Teladoc's treatment of McKay and FE2, the well-pleaded facts set forth therein, accepted as true, do not support it. In *Signet*, the pervasive misconduct consisted of "rampant" sexual harassment "at all levels," ranging from "store level employees" to "senior executives," including the company's CEO. *Signet I*, 2018 WL 6167889, at *6. "[T]he ranks of Signet's executives were filled with 'womanizers,' 'playboy[s],' and serial sexual harassers who made 'sexual conquests of female associates.'" *Id.* "[F]emale employees were propositioned to engage in sexual behavior in exchange for employment advancement opportunities; those who did so were rewarded by way of promotion, and those who declined or reported the activity to an 'anonymous' hotline were retaliated against." *Id.* Moreover, this misconduct had already resulted in a concrete business risk for the company, in the form of a class action alleging gender discrimination (the "Jock Litigation") which the company downplayed in its SEC filings, falsely characterizing the case as based on "the allegations of 15 former and current employees working in a few stores" when in fact "nearly 200 employees" submitted (initially nonpublic) affidavits "detailing their experiences" in support of class certification. *Id.* at *5. When those affidavits were disclosed, in February 2017, the price of Signet's stock fell 13% in a single day. *Id.* at *6. Moreover, as Judge McMahon made clear on reconsideration, both the false statements about the Jock Litigation and the company's touting of its conduct and ethics codes (which among other things "affirm[ed] the company's commitment to making hiring decisions solely on the basis of merit, disciplining misconduct in its ranks, and providing employees with a means to report sexual harassment without fear of reprisal") were part of its effort to "reassure the investing public that that Signet did not, in fact, have a toxic workplace." *Signet II*, 389 F. Supp. 3d at 331.

Similarly, in *Banco Bradesco*, the company's statements (including that it had "an 'effective' anti-corruption policy") were made "in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery," at a time when bribery investigations were rocking the Brazilian business community and threatening to reduce investor confidence and "adversely affect the results of our operations." 277 F. Supp. 3d at 660. Moreover, when Banco Bradesco told the public that it had an "effective" anti-corruption policy in place, "executives in the highest echelons of the Company were actively involved in bribing a government official," *id.* at 600, as part of an eleven-year-long bribery scheme ultimately resulting in the criminal indictments of three senior Banco Bradesco executives. *Id.* at 612, 619, 624.

Here, by way of contrast, plaintiffs allege no facts to suggest either that the newly-challenged statements were made in an effort to lull investors or regulators or that "pervasive" misconduct was "rampant" at "all levels," including among the Company's senior executives. Instead, as relevant to their *new* theory of liability, plaintiffs allege a fairly slim set of facts: that the Company's HR Department was dismissive of the initial complaint from McKay about the "inappropriate relationship" between Hirschhorn and Griffin in late 2015 or early 2016, TAC ¶¶ 40, 42, 62; that the Board of Directors did not investigate and discipline Hirschhorn until McKay sent a written memo to the Legal Department in October 2016, *id.* ¶¶ 43-44, 49 (at which point it did investigate and discipline him, albeit less harshly than plaintiffs consider appropriate); and that two employees – McKay and FE2 – suffered retaliation after reporting the misconduct, in McKay's case leading to her firing in October 2017 (with a severance package) and in FE2's case consisting of "bullying," administered by a Vice President of Operations and his team, which continued even after FE complained about it to HR. *Id.* ¶¶ 13, 35, 51-52.

These facts, taken as true for purposes of the pending motion, are insufficient to demonstrate that Teladoc "in fact, held none of its asserted aspirations." *CBS*, 433 F. Supp. 3d at 533, 535. Not only is the alleged misconduct relatively minor in scope and scale compared to *Signet* and *Banco Bradesco*; it is significantly less egregious than the undisclosed violations in *Papa John's* and *CBS*, both of which involved multiple instances of sexual harassment, against multiple victims, by the company's CEO and other senior executives,[20] in violation of strong anti-sexual harassment language in the companies' ethics codes and related pubic statements.[21] Additionally, in *CBS*, there were "allegations of retaliation against victims by those managers," 433 F. Supp. 3d at 526, notwithstanding the company's assurances that it "will not tolerate retaliation against any person who makes a good faith report of misconduct," that "effective remedial action would be taken" if "harassment or retaliation has occurred," and that employees "will not be retaliated against because of a good faith report or because you cooperate with an investigation of a suspected violation." *Id.* at 533 & n.8, 534 & n.9.

Notwithstanding this relatively strong language, Judge Wood held squarely – twice – that the challenged statements in Papa John's code of ethics and related public disclosures were "not

[20] Papa John's was sued after *Forbes* magazine published claims by 37 former employees "describing disturbing instances of workplace sexual harassment and misconduct" by CEO John H. Schnatter, President (and successor CEO) Steve M. Ritchie, and operations lead Dustin Couts. *Papa John's II*, 517 F Supp. 3d at 203. In *CBS*, the *New Yorker* detailed accusations from "six women who claimed that [CEO Les Moonves] had sexually assaulted them." 433 F. Supp. 3d at 527. Additionally, "[p]roducer Brad Kern, executive producer Andrew Kreisberg, vice president Vincent Favale, and other senior level managers were accused of sexual harassment," requiring CBS to "settle[ ] several related lawsuits." *Id.* at 526. Later, a newspaper detailed similar misconduct by TV host Charlie Rose "involving multiple women," leading CBS to fire Rose, *id.*, and another newspaper implicated "60 Minutes" chief Jeff Fager. *Id.* at 527.

[21] Papa John's was committed to "ensuring a working environment 'free of harassment or other intimidating, hostile, or offensive behavior.'" *Papa John's II*, 517 F. Supp. 3d at 208. CBS, as noted above, had a "zero tolerance policy for sexual harassment," and stated that it would take "all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware." *CBS*, 433 F. Supp. 3d at 528.

material, or false or misleading," *Papa John's II*, 517 F. Supp. 3d at 215, and Judge Caproni similarly dismissed all of plaintiffs' claims arising out of the CBS code of conduct, holding that the challenged statements were general and aspirational and that the alleged misconduct, "although reprehensible," was not "so pervasive that the Amended Complaint has plausibly alleged that CBS, in fact, held none of its asserted aspirations." *CBS*, 433 F. Supp. 3d at 533.

So too here. The TAC, like the SAC, fails to plausibly allege any materially false or misleading statements. Consequently, plaintiffs' securities fraud claims should be dismissed.

**B. Scienter**

Because plaintiffs have failed to plead any actionable misstatements or omissions, the Court need not reach the issue of scienter. *See Singh*, 918 F.3d at 62 ("Because we agree with the District Court regarding the absence of a material, false statement, we need not reach the issue of scienter."); *Papa John's II*, 2021 WL 371401, at *12 ("Because the Court holds that Plaintiff has not adequately pled a material misrepresentation or omission under Section 10(b) or Rule 10b-5, the Court has no occasion to address Defendants alternative grounds for dismissal, based on alleged deficiencies in Plaintiff's pleadings as to scienter[.]"); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 455 (S.D.N.Y. 2018) ("[t]he Court need not address" arguments relating to scienter where plaintiffs have "not sufficiently pleaded that [defendant] made any false or misleading statements").

**C. Control Person Liability**

Because plaintiffs have not pleaded a primary securities fraud violation, their claim for control person liability under § 20(a) of the Exchange Act should also be dismissed. *In re Liberty Tax*, 828 F. App'x at 753-54 (summary order) ("[B]ecause the amended complaint failed to set forth a primary violation of the securities laws, the district court correctly dismissed the Fund's

claim of secondary liability under § 20(a)."); *accord ATSI*, 493 F.3d at 108; *Papa John's II*, 2021 WL 371401, at *12.

**D. Leave to Replead**

In a single sentence at the end of their opposition brief, plaintiffs request that, "if any part of the Complaint is dismissed," they be granted leave to replead. Pl. Mem. at 28. In response to a similar plea made at the end of their brief in opposition to defendants' motion to dismiss the SAC, the Court granted plaintiffs leave to file the TAC, reasoning that they had "not yet had an opportunity to [amend] in response to an opinion of the Court." Op. & Order at 11.

They have now had that opportunity. Moreover, they provide no information – not even a hint – as to what more they believe they could allege to overcome the deficiencies in the TAC. Consequently, the amendment request should be denied. *See In re Ferrellgas Partners, L.P., Sec. Litig*., 2018 WL 2081859, at *20 (S.D.N.Y. Mar. 30, 2018) ("[D]istrict courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without any justification or an accompanying suggested amended pleading."), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) (summary order); *see also State Street Global Advisors Tr. Co. v. Visbal*, 462 F. Supp. 3d 435, 443 (S.D.N.Y. 2020) (Woods, J.) ("[W]here pleading deficiencies have been identified a number of times and not cured, there comes a point where enough is enough." (quotation marks and citation omitted)).

**IV. CONCLUSION**

For the reasons set forth above, I recommend, respectfully, that defendants' motion be GRANTED and that this action be DISMISSED with prejudice.

Dated: New York, New York
September 8, 2021

**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Gregory H. Woods at 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned Magistrate Judge. Any request for an extension of time to file objections must be directed to Judge Woods. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x, 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).